MORROW, County Auditor, et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. May 30, 1917.)

No. 4774.

1. CONSTITUTIONAL LAW ⬤⇒93(1)—VESTED RIGHTS—AGREEMENTS WITH INDIANS.

The government may in its dealings with Indians create property rights which, once vested, even it cannot alter, and such property rights may result from agreements either in the form of a treaty or of a statute; the important considerations being that there should be the essentials of a binding agreement between the government and the Indian and the resultant vesting of a property right in the Indian.

2. CONSTITUTIONAL LAW ⬤⇒93(1)—TAXATION ⬤⇒181—INDIAN LANDS—VESTED RIGHTS.

Act Feb. 8, 1887, c. 119, § 5, 24 Stat. 389 (Comp. St. 1916, § 4201), provided for allotments of lands to Indians and for the issuance of patents providing that the government would hold the land for 25 years in trust for the Indian and his heirs and at the expiration of such period convey it by patent discharged of the trust and free of all charge or incumbrance. Act Jan. 14, 1889, c. 24, 25 Stat. 642, provided for the appointment of a commission to obtain from the Chippewa Indians in Minnesota a relinquishment of all their lands except parts of two reservations and for allotments of lands in such reservations to individual Indians in conformity with the act of 1887. Act June 21, 1906, c. 3504, 34 Stat. 353, provides that all restrictions as to sale, incumbrance, or taxation of allotments within the White Earth Reservation held by adult mixed-blood Indians are thereby removed, that the trust deeds executed therefor are thereby declared to pass title in fee simple, and that such mixed bloods upon application shall be entitled to a patent in fee simple. *Held* that, where the Indians consented to relinquish their lands and accept allotments in such reservations under the Act of 1889, there was a valid contract between the government and the Indians, and an Indian receiving a trust patent had vested rights which could not be altered against his will, and hence where he was claiming no rights under the act of 1906, but was insisting upon holding his land under the trust patent, his land could not be taxed by the state.

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Suit by the United States against W. J. Morrow, as County Auditor of Becker County, Minnesota, and others. From a decree in favor of the government, defendants appeal. Affirmed.

Egbert S. Oakley, of St. Paul, Minn. (Lyndon A. Smith, of St. Paul, Minn., and Henry N. Jenson, of Detroit, Minn., on the brief), for appellants.

S. W. Williams, of Washington, D. C., for the United States.

Before HOOK and STONE, Circuit Judges, and MUNGER, District Judge.

STONE, Circuit Judge. Suit by the United States as trustee of lands for a mixed-blood Chippewa Indian against certain officials of Becker county, Minn., to restrain collection of tax levied upon land in the White Earth Reservation allotted and trust patented under the Nelson Act.

The case is submitted upon a stipulation of facts, the essential portions of which are that:

"The allottee of the tract of lands therein described is, and at the time of the commencement of this action was, an adult mixed-blood Chippewa Indian residing upon the White Earth Reservation, and that he has never incumbered or alienated, or attempted to incumber or alienate, said lands; that said lands are situated upon the White Earth Reservation and were allotted to said Kah-be-mah-be and were thereafter patented to him * * * pursuant to the statutes of the United States."

The sole point for decision is, in general terms, whether or not the land of an adult mixed-blood Chippewa Indian allotted, patented, and held under the provisions of the Nelson Act (January 14, 1889, 25 Stat. 642) is, since the enactment of the so-called Clapp Amendment (June 21, 1906, c. 3504, 34 Stat. 353), subject to state and local taxation, where the allottee has never attempted to avail himself of any power he might have under that amendment to alienate or incumber, but on the contrary is insisting upon holding it according to the provisions of a trust patent issued under the authority of the Nelson Act.

The patent issued on this land December 30, 1902, was what is called a "trust patent." The law required that it declare, and that its legal effect be, that the land be held "in trust for the sole use and benefit of" the Indian to whom such allotment shall have been made, or his heirs for 25 years with no power in the allottee to convey or to contract "touching the same" during that period; and that at the end of such period the United States "convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or encumbrance whatsoever." 24 Stat. 388, § 5.

Appellants properly concede that there was no right of taxation while the land was held solely under such trust patent. They contend that the Clapp Amendment enacted four years subsequent to the issue and during the life of this trust patent had the effect of terminating it and of vesting a complete fee title in the allottee irrespective of his consent to such a change. An answering contention of the government is that Congress had no power to alter this "trust patent" status without the consent of such patentee, because such trust patent, issued under the Nelson Act, conveyed a property right to this patentee which had

become vested. The property right intended being the separate beneficial use of the land free from taxation and involuntary alienation for 25 years from date of trust patent, with fee title thereafter.

[1] There is no question that the government may, in its dealings with the Indians, create property rights which, once vested, even it cannot alter. Williams v. Johnson, 239 U. S. 414, 420, 36 Sup. Ct. 150, 60 L. Ed. 358; Sizemore v. Brady, 235 U. S. 441, 449, 35 Sup. Ct. 135, 59 L. Ed. 308; Choate v. Trapp, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941; English v. Richardson, 224 U. S. 680, 32 Sup. Ct. 571, 56 L. Ed. 949; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49; Chase v. U. S., 222 Fed. 593, 596, 138 C. C. A. 117. Such property rights may result from agreements between the government and the Indian. Whether the transaction takes the form of a treaty or of a statute is immaterial; the important considerations are that there should be the essentials of a binding agreement between the government and the Indian and the resultant vesting of a property right in the Indian.

[2] That exemption of land from taxation is a property right is established. Choate v. Trapp, supra. That this Indian had taken possession of and was enjoying this land under such an exemption at the time the Clapp Amendment was passed is undisputed. Therefore, if this exemption came to him as a legal right, it had fully vested. It came as such legal right if it rested on the solid basis of a binding agreement. If there was such an agreement here, it is to be found in the terms of the Nelson Act, read in the light of attendant circumstances. These circumstances are revealed in the communication of the Interior Department recounting the negotiations between the Commissioners and these Indians (Doc. 247, published in volume 32, House Exec. Doc. 51st Cong. 1st. Sess).

At the passage of that act, the Chippewa Indians were scattered over several reservations in the state of Minnesota. Much of their land was held as tribal by different bands or communities while some was held in severalty. The Indians were in dire need from crop failures. Their condition generally was very unsatisfactory. Their reservations included some supposedly valuable mineral land and much very valuable timber land; the worth of the latter, as stated by the commissioners, having been estimated at from $25,000,000 to $50,-000,000. Their title to these lands was unquestioned by the government and sprang from several successive treaties, the last being that of March 19, 1867 (16 Stat. 719). Under such circumstances this act was passed, as its title attests, for their "relief and civilization."

The broad objects of the act were: The concentration of these Indians upon two reservations (White Earth and Red Lake); allotments thereon in severalty; acquirement by the government of title to the surplus beyond these allotments for sale to establish a fund; the net income from this fund to be utilized for 50 years for the support, civilization, and education of these Indians; the final distribution of the fund among them.

With unquestioning recognition of the Indian title to all of these lands, both tribal and allotted, the first sentence of this act provided for the appointment by the President of a commission "to negotiate with all the different bands or tribes of Chippewa Indians in the state of Minnesota for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the state of Minnesota, except the White Earth and Red Lake Reservations, and to all and so much of these two reservations as in the judgment of said commission is not required to make and fill the allotments required by this and existing acts, and shall not have been reserved by the commissioners for said purpose"; such cession and relinquishment to be "for the purpose and upon the terms hereinafter stated." The act provided that, where an allotment of land in severalty had theretofore been made on any reservation, the allottee "shall not be deprived thereof or disturbed therein except by his own individual consent separately and previously given." As to tribal lands the act required the cession to be "assented to in writing by two-thirds of the male adults over eighteen years of age of the band or tribe of Indians occupying and belonging to such reservations," with a like assent by two-thirds of the male adults of all Chippewas in Minnesota as to the Red Lake Reservation. It further provided that such "agreements" should be approved by the President before becoming effective. Section 3 provided for the removal of the Indians and the allotments of lands as soon as "the cession and relinquishment has been obtained, approved, and ratified." Section 4 required the survey and classification for sale of the "lands so ceded to the United States" "as soon as the cession and relinquishment of said Indian title has been obtained and approved as aforesaid." So much for the terms of the act.

The commissioners provided for in the act secured the written consent of the required number of Indians only after almost six months of patient negotiations. The cession was later ratified by the President and thereupon became effective, the Indians removed to the two reservations, relinquished the balance of their lands, and received allotments in severalty.

Thus the terms of this act, as well as its attendant circumstances, leave no doubt that this act required, before it should become effective, an agreement to its terms by the Indians and the cession by them of very valuable tracts of lands to which their title was unimpeached. The Indians fully performed their part of the agreement, and it was in exact performance upon its side that the government allotted to this Indian his land and was holding it for him at the time the Clapp Amendment was enacted. Such a proposal, acceptance, passage of consideration, and performance between private parties would constitute a valid contract. The character of the transaction is not changed because one of the parties to it is the government.

Appellants seem to regard this allotment as made solely under the General Allotment Act (Feb. 8, 1887, 24 Stat. 388), and clothed only with such rights as might attach to any allotment made under that act alone. This is based on the provision in section 3 of the Nelson

Act, which is that the allotment thereunder should be "in conformity with" the General Allotment Act. The Nelson Act, except for its reference to the General Act, is silent as to the character of interest or title to be acquired by the Indians through the allotments. Obviously that would be one, if not the most important, of the considerations in the minds of the Indians. Clearly this, although but a part, would be a vital part of the agreement to them. To execute that part of the plan, the method laid down in the recently enacted General Allotment Act was deemed suitable. Therefore it was, by reference instead of repetition, incorporated into the Nelson Act as a part of that agreement. The General Act, § 5, set this forth in detail. It provided that the title should be held by the President in trust for 25 years free from "all charge or incumbrance," which meant, in effect, freedom from taxation.

If the Nelson Act had set out in detail the terms upon which the allotments were to be made, it could not be successfully contended that those terms were not a part of the agreement, or that any title or rights resulting therefrom when once vested would not be free from alteration. Can this be less true because the allotment method is incorporated by reference? This incorporation of the method outlined in the General Allotment Act by reference made that method part of the agreement with precisely the same effect as though its terms had first found expression by being set out in full as a section of the Nelson Act. The General Allotment Act was not made applicable to these allotments in any other sense. They were not under the authority of the General Allotment Act at all, but "in conformity with" it under the authority of the Nelson Act.

If there were any doubt as to the status of this matter, the understanding of the Indians as to the agreement would control. Kansas Indians, 5 Wall. 737, 18 L. Ed. 667; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49. Several hundred copies of both the Nelson and of the General Allotment Acts were distributed among the Indians and were discussed by them and the commissioners as constituting parts of one agreement. As to these very matters of title and taxation, the Indians were very inquisitive and solicitous. The commissioners gave them the direct assurance that their alloted lands would not be taxed for 25 years "because the President holds this land in trust for you," and it was so understood by them.

A trust patent in exact compliance with such understanding and agreement was issued this Indian, and under it he has taken and holds this land. His rights are vested and are impervious to alteration against his will except through the sovereign power of eminent domain. One of these rights was freedom from state and local taxation.

The court has not overlooked the decisions in Dickson v. Luck Land Co. (January 8, 1917) 242 U. S. 371, 37 Sup. Ct. 167, 61 L. Ed. 371, and United States v. Waller (April 9, 1917) 243 U. S. 452, 37 Sup. Ct. 430, 61 L. Ed. 843. In the Dickson Case the only question was whether, in a suit between rival grantees of land allotted and patented to a mixed-blood Chippewa Indian in the White Earth Res-

ervation, and by him conveyed, the issue of the patent (not a trust patent) was conclusive as to the adulthood of the Indian at the time of its issue. There the Indian had fully availed himself of the terms of the Clapp Amendment, had secured a patent thereunder, and had alienated his land. The suit in this court is based upon refusal of this Indian to change his status by acceptance and exercise of the powers offered in the Clapp Amendment. In the Waller Case the question was whether the government could properly bring a suit to set aside conveyances of land by mixed-blood Chippewa Indian allottees on the ground that the conveyances had been fraudulently obtained. The court held the government was not a proper party because the wardship of the government had been, in respect to their lands, removed from such Indians by the Clapp Amendment. The court says:

"The act thus evidences a legislative judgment that adult mixed-blood Indians are, in the respects dealt with in the act, capable of managing their own affairs, and for that reason they are given full power and authority to dispose of allotted lands."

The instant case is not one depending upon governmental wardship over a dependent and inferior people, but is based upon the legal relation of trusteeship, and springs from the obligation contained in the terms of the trust to preserve the land, so that at the end of the trust period it can be passed to the beneficiary "free of all charge or incumbrance."

The judgment is affirmed.