## COUNTY OF MAHNOMEN *v.* UNITED STATES.

No. 684.   Argued May 4, 1943.—Decided June 7, 1943.

*Messrs. L. A. Wilson* and *Geo. B. Sjoselius,* Assistant Attorney General of Minnesota, with whom *Mr. J. A. A. Burnquist,* Attorney General of Minnesota, was on the brief, for petitioner.

*Mr. Vernon L. Wilkinson,* with whom *Solicitor General Fahy* and *Assistant Attorney General Littell* were on the brief, for the United States.

Mr. Justice Black delivered the opinion of the Court.

This action was brought by the government in a federal district court to recover real estate taxes alleged to have been illegally collected by Mahnomen County, Minnesota, from Isabelle Garden, an Indian allottee.[1] The suit, brought in 1940, seeks a refund of taxes for the years 1911 to 1927 inclusive. It is conceded that any limitation on the County's power to tax expired in 1928 with the termination of the twenty-five year trust described below. The District Court rendered judgment against the County for the years 1911 to 1921, inclusive, giving a total judgment of $405.97. On appeal by both the government and the County, the Circuit Court of Appeals affirmed but gave an added judgment for the years 1922 through 1925. 131 F. 2d 936.

In its petition for certiorari, the County claimed that Garden was an emancipated Indian who had paid the taxes voluntarily, and that hence the judgment granting a refund conflicts with *Ward* v. *Love County,* 253 U. S. 17. The County also contended that it was wholly within an Indian reservation; that it had long been dependent on taxation of allotted lands; that after the passage of the first Clapp Amendment in 1906, 34 Stat. 325, 353, which emancipated the Mahnomen County Indians, and lifted "all restrictions as to the sale, incumbrance, or taxation for allotments," the County had assumed that the Indians could voluntarily contribute to the support of county institutions; and that while the instant judgment is small, the aggregate amount of such judgments which might be obtained in similar actions would adversely affect the solvency of the County and imperil the continuance of

---

[1] The government's original complaint included additional claims against Mahnomen and other counties, but these other claims are not involved in the case as it reaches us.

county institutions. On these representations of the public importance of the case, we granted certiorari.

In 1902, the Secretary of the Interior, acting under Congressional authority, issued a patent to this Indian allottee, agreeing to hold a tract of land in trust for twenty-five years "for the sole use and benefit of the Indian" and then to convey the land to her "discharged of said trust and free of all charge or incumbrance whatsoever." [2] Indian land so held by the government has been said to be exempt from all state taxation. *United States* v. *Rickert,* 188 U. S. 432, 436–438. The first and second Clapp Amendments, passed in 1906 and 1907,[3] lifted restrictions previously imposed upon the sale, encumbrance and taxation of the allotments of adult mixed-blood Indians, and in addition declared that "the trust deeds heretofore or hereafter executed by the Department for such allotments, are hereby declared to pass the title in fee simple." Garden is an adult mixed-blood Indian and has been an adult since 1911, when the first controverted tax payment was made. These amendments evidence "a legislative judgment that adult mixed-blood Indians are, in the respects dealt with in the act, capable of managing their own affairs, and for that reason they are given full power and authority to dispose of allotted lands." *United States* v. *Waller,* 243 U. S. 452, 462; *Baker* v. *McCarthy,* 145 Minn. 167, 170, 176 N. W. 643.

Notwithstanding these acts the County concedes, and we assume arguendo, that it was without power to impose a tax upon these allotted lands prior to 1928 against the consent of the Indians. *Choate* v. *Trapp,* 224 U. S. 665.[4] The

---

[2] 24 Stat. 388, 389; 25 Stat. 642.

[3] 34 Stat. 325, 353; 34 Stat. 1034.

[4] We do not consider whether *Choate* v. *Trapp* is controlling here. In that case the government had patented land with a provision that "the land should be non-taxable" and the agreement with the Indians was held to be a contract which, "having been accepted by the State

Clapp Amendment gives the consent of the United States to state taxation, thus removing the barrier to taxation found to exist in *United States* v. *Rickert, supra;* but under *Choate* v. *Trapp* the Indian, who has gained a "vested right" not to be taxed, must also consent.   Acceptance of *Choate* v. *Trapp* does not mean that an Indian, legislatively declared to be competent to handle his own affairs, cannot voluntarily decide to pay taxes for his own advantage and welfare.   If, as the petitioner argued, and as the government does not deny, the capacity of the County to provide schools, roads, and other necessary services would have been seriously jeopardized, if not destroyed, by the failure of the Indians to contribute to a tax fund, their newly granted emancipation would have been of little value.   In addition, the market value of their lands would have been greatly reduced by the complete inability of the County to secure funds essential to the establishment of means of travel and communication and the maintenance of an orderly society.   Nothing that was said in *Choate* v. *Trapp,* or in any other decision of this Court, deprived an emancipated Indian of freedom voluntarily to pay taxes in his own interest.   *Ward* v. *Love County,* 253 U. S. 17, 22, assumed that the test of the right to recover a tax illegally collected from an Indian is whether the tax was paid voluntarily, and that the burden is upon one seeking recovery of the tax to establish that the payment was made involuntarily.   The issue before us, therefore, is whether the government has sustained that burden.

There is no allegation, stipulation, or finding by either court that these taxes were involuntarily paid.   Both courts below erroneously assumed that the government's original obligation to hold the land in trust and deliver it free of encumbrances permits the government to main-

---

of Oklahoma in its Constitution upon admission to statehood, was a limitation upon the taxing power of the State." *Carpenter* v. *Shaw,* 280 U. S. 363, 366.

tain this suit even though the Indian has willingly paid taxes. 1911–1921 taxes were evidently paid without protest, and there is nothing in the record to permit a deduction that the payments were involuntary.[5]

The 1922–25 taxes were discharged in somewhat different fashion. The allottee became delinquent in the payment and the lands were sold to the State. Subsequently, in 1936, she made a compromise arrangement with the State, for a period including not only the years 1922–27, for which tax exemption is claimed, but also for the years 1928–34, for which there is no conceivable claim of exemption. This compromise, made in the form of purchase of two tax certificates for the allottee, resulted in payment by Garden for the entire 1922–34 period of *less* than the amount of the 1928–34 taxes. The compromise, made at a time when the Indian was fully as free as any other citizen, was, in the words of the District Court, a "voluntary action and election of the allottee to proceed in a manner which she deemed wise and prudent." It resulted in a net saving to the allottee of $66.42 for the taxable years 1928–1934.[6] The voluntary nature and the

---

[5] In 1923 Garden sued in a state court for recovery of her 1911–1921 taxes. A demurrer was sustained in the trial court and no appeal was taken. The record does not show that she had made the tax payments under protest, which would probably have entitled her to recovery under state law according to the doctrine of *Warren* v. *Mahnomen County*, 192 Minn. 464, 257 N. W. 77. This action, brought after the tax benefits had been enjoyed, is no indication that she did not originally pay the taxes willingly in order to enjoy the benefits of county government. We need not consider the contention of the County that the 1923 action is res adjudicata. Cf. *Bryan County* v. *United States*, 123 F. 2d 782.

[6] The parties have entered the following stipulation as to the payment of these taxes: "That said taxes for the years 1922 to 1927, both inclusive, were paid and discharged by the said allottee by the purchase by her of State Assignment Certificate No. 76 in the amount of $33.22 covering the taxes for the years 1922 to 1925, both inclusive, and State Assignment Certificate No. 232 in the amount of $145.93 covering taxes for the years 1926 to 1934, both inclusive, all pursuant

fairness of the 1936 settlement are further indicated by the fact that the County, in its answer to the complaint, has declared its willingness to refund the sum paid in settlement in order that it may relevy the taxes for the years 1928 and 1934 and thus collect the taxes which Garden admittedly owed.

The allottee paid the 1911–21 taxes voluntarily and settled the balance of her taxes to her advantage in 1936. Neither Minnesota law [7] nor federal law [8] requires that

to Chapter 387 Laws of Minnesota for 1935, that the aggregate for said State Assignment Certificates is the sum of $179.15 and that the valid taxes for the years 1928 to 1934, both inclusive, thereby discharged amounted to $245.57 without penalty or interest and that therefore said allottee effected a saving of $66.42 plus penalty and interest by the purchase of said State Tax Assignment Certificates."

The government in effect concedes the merit of the argument that the 1936 settlement was a fair and voluntary compromise but seeks to avoid its force by an assumption that the two tax certificates are to be treated in different fashion. As the stipulation makes clear, Certificate No. 76 formally covers the years 1922–25, and No. 232 covers the years 1926–34. In view of the substantial benefit received by the allottee from the compromise, the government has waived its claim for any refund for the years 1926–27, but it apparently assumed that Certificate No. 76 was unrelated to this compromise. However, both certificates were purchased at the same time, both covered the same lands, and each would be worthless without the other since the Minnesota law under which the arrangement was made is aimed at the settlement of all delinquent taxes. C. 387, Minn. Laws, 1935; Minn. Stat. (Henderson, 1941), § 280.11–13; cf. *Security Trust Co.* v. *Heyderstaedt*, 64 Minn. 409, 67 N. W. 219. The reason for the use of two certificates, one for the years prior to 1925 and the other for the years thereafter, may have resulted from the fact that the Minnesota statute applies different standards of value to compromises of taxes delinquent prior to 1925 and those delinquent thereafter. As is indicated by the stipulation, the transaction for the two certificates was considered as a unit and is in fact one compromise, termed by the trial judge a settlement for a "lump sum."

[7] *Falvey* v. *Board of County Comm'rs*, 76 Minn. 257, 79 N. W. 302; *Warren* v. *Mahnomen County, supra.*

[8] *Ward* v. *Love County, supra; Carpenter* v. *Shaw,* 280 U. S. 363.

a county refund taxes which an emancipated Indian has voluntarily paid. The County is entitled to judgment in its favor.

*Reversed.*

MR. JUSTICE FRANKFURTER and MR. JUSTICE RUTLEDGE concur in the result.

MR. JUSTICE MURPHY, dissenting:

I dissent because the Court today takes too narrow a view of our obligations to our Indian citizens—obligations engendered by a history marked at times with trespass, depredation and corruption, and by the concomitant necessity of aiding and protecting a people once dependent and unlearned in our ways during their difficult period of transition from that situation to the assumption of civic responsibilities and assimilation into the mass of our citizenry.

The assumptions which the opinion of the Court makes regarding the tax status of Isabelle Garden's allotted land but state the applicable law. The land which she received in 1902 under a trust patent, issued pursuant to the Nelson Act (25 Stat. 642) and the General Allotment Act (24 Stat. 388), was exempt from state and local taxation for a period of 25 years, or until 1928. *United States* v. *Rickert,* 188 U. S. 432; *Board of Commissioners* v. *Seber,* 318 U. S. 705. Since the tribe to which she belonged gave up its extensive holdings after assurances that the forthcoming allotments would be non-taxable for 25 years,[1] this tax exemption was a vested right of which she could not be deprived without her consent. *Choate* v. *Trapp,* 224 U. S. 665; *Ward* v. *Love County,* 253 U. S. 17; *Carpenter* v. *Shaw,* 280 U. S. 363. Consequently, although Isabelle Garden upon reaching her majority in 1911 became eman-

---

[1] House Ex. Doc. 247, 51st Cong., 1st Sess. (Ser. No. 2747), pp. 93, 103, 104, 138 (1890). See also *Morrow* v. *United States,* 243 F. 854.

cipated by virtue of the Clapp Amendments of 1906 and 1907 (34 Stat. 353, 1034), that legislation did not disturb her vested tax exemption.

The Court's reliance upon *Ward* v. *Love County,* 253 U. S. 17, as the basis for its decision with regard to the 1911–21 taxes paid by Isabelle Garden is unwarranted. In that case it was assumed that an emancipated Indian possessing a vested tax exemption could not recover back taxes illegally assessed but voluntarily paid. 253 U. S. at 22. But that case did not hold, as the Court now asserts that it did, that the burden was on the Indian claimant to establish the involuntary character of the payment. Still less, since the United States was not a party, did it consider what the rights of the United States would be should it bring suit on behalf of the Indian. That is the instant question, and while it is ordinarily true that the burden of demonstrating the illegality of a collected tax and compliance with the statutory requirements for refund are upon the taxpayer seeking recovery, strong reasons of policy suggest an opposite rule should prevail in this case. While "emancipated" upon attaining twenty-one, Isabelle Garden was an Indian "just emerging from a state of dependency and wardship," *Ward* v. *Love County, supra,* at p. 23, and the United States had the right, if not the duty, to enforce for her benefit its guarantee of tax immunity even though she was a citizen, the restrictions on her property were removed, and she was otherwise emancipated from a wardship status. Cf. *Cramer* v. *United States,* 261 U. S. 219, 232; *Heckman* v. *United States,* 224 U. S. 413, 437; *United States* v. *Minnesota,* 270 U. S. 181, 194. To hold that the United States is foreclosed by action which Isabelle Garden may have taken or failed to take in ignorance of her legal rights is to hinder the United States in the performance of its considered policy of protection and to deprive her indirectly of that of which she could not directly be deprived—her vested tax

exemption. Without legal right the County placed her tax-exempt property upon its tax rolls immediately upon her reaching adulthood, assessed it, and she paid the taxes under circumstances not fully disclosed. In this situation it is only fair to put the burden on the County, whose unauthorized action brought it about, of establishing that she paid the taxes of her own free will with full knowledge of her legal rights. A contrary rule fails, to take into account the long and not altogether creditable history of our relations with the Indians and the obligations we owe to those people to protect them in their rights.

Apart from the question of burden of proof, however, I cannot agree with the opinion of the Court. The crucial issue with regard to the 1911–21 taxes is assumed to be the voluntary or involuntary character of those payments. The trial court admittedly made no findings on this issue, and, in the absence of such findings, the proper procedure would be to remand the case to the trial court. Cf. *Seminole Nation* v. *United States*, 316 U. S. 286, 300. But if we are to decide the case here by indulging in presumptions, I think the only tenable assumption is that the payments were made under compulsion. Isabelle Garden's land was assessed immediately after she became twenty-one, and she ran the risk of losing it unless she paid the taxes. The record shows that some of the Indians, originally included in this action, who failed to pay their taxes did lose their allotments. On the record it cannot be said with certainty that Isabelle Garden paid the taxes for any other purpose than to prevent her allotment from being sold for unpaid taxes. This is borne out by the fact that she herself brought suit in 1923 to recover the 1911–21 taxes.[2] Suggested

[2] This unsuccessful suit is no bar to the present action by the United States. The interest of the United States in having its obligations and policies respected cannot be defeated by judgments in actions to which it is not a party. *United States* v. *Candelaria*, 271 U. S. 432, 443–44;

reasons for finding that the payments were voluntary are without substance. Isabelle Garden did not have to pay those taxes for the privilege of managing her allotment as she wished. That right was hers under the Clapp Amendments which were competent to remove the restrictions upon her land, but not the vested tax immunity. Cf. *Choate* v. *Trapp, supra,* p. 673. And there is nothing in the record, apart from argument contained in the County's unsuccessful motion for a new trial, to support the assumption that she voluntarily paid the taxes to enjoy the benefits of county government. Payments made under circumstances such as this, where an exempt Indian runs the risk of losing her allotment unless the taxes are paid, should not be considered voluntary payments. Cf. *Ward* v. *Love County, supra,* p. 23; *Carpenter* v. *Shaw,* 280 U. S. 363, 369.

Finally, I cannot assent to the proposition that since Isabelle Garden settled her taxes for 1922 through 1934 for less than the amount she owed for taxes validly assessed for the period beginning in 1928 when her land became taxable, the United States cannot recover for her the amounts she paid to discharge the 1922–25 taxes. Those taxes were discharged in 1936 by the purchase of State Assignment Certificate No. 76. At the same time, the taxes for 1926–34 were discharged by the purchase of another assignment certificate. The fact, unexplained by the stipulation, that two certificates were used to discharge the taxes suggests that there was no relation between the discharge of the 1922–25 taxes and the settlement of the admittedly due taxes for 1928–34. But even if a relation is assumed, the United States should still be allowed to recover the amount paid for Assignment

---

*Sunderland* v. *United States,* 266 U. S. 226, 232; *Privett* v. *United States,* 256 U. S. 201, 204; *Bryan County* v. *United States.* 123 F. 2d 782.

Certificate No. 76. Isabelle Garden probably would have been able to compromise her 1928–34 taxes even more advantageously if the County had not asserted its unwarranted claims for the years 1922–25 during which period the property was still tax exempt. That is sufficient to warrant recovery of the amount paid for Assignment Certificate No. 76 in discharge of the 1922–25 taxes.[3]

---

[3] This analysis also indicates that the portion of the assignment certificate covering the period 1926–34 which discharged the taxes levied for 1926 and 1927 should be returned. The Government, however, presses no claim for these amounts here.