STATE of Minnesota, et al., Appellants,

v.

ZAY ZAH et al., Respondents,

A. J. Powers, et al., Defendants.

No. 46834.

Supreme Court of Minnesota.

Oct. 21, 1977.

Rehearing Denied Nov. 17, 1977.

Aurel L. Ekvall, County Atty., Bagley, for appellants.

John M. Holmes, Indian Legal Assistance Program, Duluth, for respondents.

James W. Moorman, Acting Asst. Atty. Gen., Raymond N. Zagone, Edward J. Shawaker, Dept. of Justice, Washington, D.C., amicus curiae (seeking affirmance).

Tupper, Smith & Seck, Kent P. Tupper, Gerald L. Seck, Peter W. Cannon and Kimball D. Mattson, Walker (seeking affirmance), for Wh. Earth Res. Bus. Comm., amicus curiae.

George Goodwin, Bureau of Indian Affairs, Minneapolis, amicus curiae (seeking affirmance); Bernard P. Becker, St. Paul (of counsel).

SCOTT, Justice.

This is an appeal in an action to quiet title to real estate. Eugene and Laurie Stevens commenced the action in June 1974 in the district court of Clearwater County. In July 1974 the State of Minnesota and the County of Clearwater were joined as party plaintiffs. The matter was heard before the district court on August 28, 1975. On March 1, 1976, the court entered an order for judgment in favor of defendant George Aubid, Sr., the sole heir of defendant Zay Zah. Plaintiffs appeal from this judgment. We affirm.

This case was submitted to the district court upon a stipulation of the following facts:

"1. The following facts are admitted by both parties and shall be taken as true for the purposes of this action. No evidence of said facts other than this Stipulation need be adduced upon the trial.

"2. That the controversy herein relates only to the Northwest Quarter of the Southeast Quarter (NW ¼ SE ¼), Section Five (5), Township One Hundred Forty-four (144) North, Range Thirty-eight (38), West, Clearwater County, Minnesota, and that the parties hereto agree that said described real estate is located within the original boundaries of the White Earth Reservation in the State of Minnesota, and that the sovereignty of the United States extends over said described tract.

"3. [This paragraph was in dispute and was stricken by the district court by agreement of the parties.]

"4. That on September 6, 1927, the United States allotted unto Zay Zah, also known as Charles Aubid, one of the defendants herein, the above described real estate, declaring that the United States did hold and would hold said real estate thus allotted, subject to all statutory provisions and restrictions, for a period of twenty-five years in trust for the sole use and benefit of said Indian, and at the expiration of said period the United States would convey the same by patent to said Indian in fee, discharged of said trust and free from all charge and encumbrance whatsoever, which trust patent was filed for record August 18, 1941, in Book 30 of Deeds, page 531 in the Office of the Register of Deeds, Clearwater County, Minnesota.

"5. That said Zay Zah, also known as Charles Aubid, did not at any time during his lifetime apply for a patent in fee simple to the above described real estate or convey the same.

"6. That on September 11, 1940, the Auditor for Clearwater County executed a tax certificate of forfeiture, certifying that the time for redemption of the above described real estate for nonpayment of taxes for the year 1931 had expired and that absolute title to said real estate thereby vested in the State of Minnesota and that said tax certificate of forfeiture was recorded in the office of the Register of Deeds, County of Clearwater, in Book I of Miscellaneous, page 602; and that an Application for Cancellation of said Certificate of Forfeiture for the reason that said real estate was held under a Trust Patent, the terms of which had not expired, and therefore tax exempt, was upon the recommendation of the County Board cancelled on January 30, 1947, as to the above described real estate, which certificate was registered in the office of the Register of Deeds, County of Clearwater, in Book K of Miscellaneous, page 246.

"7. That the County of Clearwater thereafter assessed real estate taxes upon the above described property for the year 1954, at which time the above described property appeared of record in the Office of the Register of Deeds of Clearwater County in the name of Zay Zah, who at that time was an adult mixed blood Chippewa Indian, and also known as Charles Aubid, one of the defendants herein.

"8. That in proceedings to enforce the payment of taxes claimed to be delinquent for the year 1954, the County of Clearwater obtained a real estate tax judgment which was entered in the district court for said county on March 27, 1956; that on October 2, 1961, the auditor for the County of Clearwater executed a tax certificate of forfeiture, certifying that the time for redemption of said real estate had expired, and that absolute title to said real estate thereby vested in the State of Minnesota.

"9. That the Commissioner of Taxation for the State of Minnesota conveyed the above described real estate by Conveyance of Forfeited Lands, dated May 4, 1973, unto Eugene Stevens and Laurie Stevens, as joint tenants and not as tenants in common, their assigns, the survivor of said parties, and the heirs and as-

signs of the survivor, forever, excepting and reserving to the said state, in trust for the taxing districts concerned, all minerals and mineral rights, as provided by law, Eugene Stevens and Laurie Stevens to have and to hold the same, together with all the hereditaments and appurtenances thereunto belonging or in anywise appertaining, to said parties, their assigns, the survivor of said parties, and the heirs and assigns of the survivor, forever, said parties taking as joint tenants and not as tenants in common.

"10. That the pleadings herein set forth the claims of the parties herein and that to that extent only the same shall constitute a part of this stipulation.

"11. That the parties disagree as to which party, if any, is in possession of the real estate, but said issue shall not be submitted to the Court for determination for the reason that the issue is neither jurisdictional nor does it go to the merits of the controversy once the defendant has interposed his own prayer for affirmative relief.

"12. This Stipulation is for purposes of trial of the above entitled action only, and the matters contained herein are not admitted for the purpose of any other trial or litigation.

"13. That Zay Zah, also known as Charles Aubid, is shown by the roll of the Chippewa Indians allotted within the White Earth Reservation in the State of Minnesota, prepared by the commission duly appointed under the Act of Congress of June 30, 1913, as amended by the Act of Congress on March 2, 1917, and that said roll shows as of the 1st day of October, 1920 that said Zay Zah was an adult mixed blood Indian.

"14. That the White Earth Reservation is a constituent element of the Minnesota Chippewa Tribe."

The district court concluded that the 1927 trust patent issued to Zay Zah continues in effect, thus making George G. Aubid, Sr., sole surviving heir of Zay Zah, the "sole beneficial owner and cestui que trust" of the disputed property.

We find the legal issue presented by these facts to be: Was the property in question subject to tax forfeiture following the expiration of the original trust patent, or did that patent remain in effect beyond the initial 25-year term?

The parties agree that during the original 25-year period of the trust patent given to Zay Zah in 1927, the property was not subject to state taxation. Appellants cite *United States v. Rickert*, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903), to this effect. Appellants and respondents assert different bases for this tax exemption, however. Appellants claim that the Clapp Amendment, discussed *infra*, eliminated the "trust" aspect of the patent, but could not divest the right not to be taxed during the duration of trust patent. This of course leads to the conclusion that taxation could begin when the 25 years expired. Respondents on the other hand, argue that the "trust status" of the allotment was in itself a constitutionally protected vested property right, thereby preventing taxation not only during the 25-year period, but also thereafter by reason of indefinite extension of the "trust status" by the Wheeler-Howard Act of 1934. The pertinent part of that statute states:

"The existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress." 48 Stat. 984, 25 U.S.C.A., § 462.

Appellants' argument makes the Wheeler-Howard Act inapplicable because there would be no "trust" to continue following the 25-year period. The crux of the matter is therefore the relationship between the trust patent issued to Zay Zah in 1927 and the Clapp Amendment.

The trust patent contains the following relevant language:

"NOW KNOW YE, that the UNITED STATES OF AMERICA, In consideration of the premises, has allotted, and by these presents does allot, unto the said Indian the land above described, and hereby declares that it does and will hold the land

thus allotted (subject to all statutory provisions and restrictions) for the period of twenty-five years, in trust for the sole use and benefit of the said Indian and at the expiration of said period the United States will convey the same by patent to said Indian, in fee, discharged of said trust and free from all charge and incumbrance whatsoever: but in the event said Indian dies before the expiration of said trust period, the Secretary of the Interior shall ascertain the legal heirs of said Indian, and either issue to them in their names a patent in fee for said land or cause said land to be sold for the benefit of said heirs as provided by law."

The Clapp Amendment, dated June 21, 1906, 34 Stat. 353, reads in relevant part as follows:

"That all restrictions as to the sale, incumbrance, or taxation for allotments within the White Earth Reservation in the State of Minnesota, now or hereafter held by adult mixed-blood Indians, are hereby removed, and the trust deeds heretofore or hereafter executed by the Department for such allotments are hereby declared to pass the title in fee simple, or such mixed-bloods upon application shall be entitled to receive a patent in fee simple for such allotments; and as to full-bloods, said restrictions shall be removed when the Secretary of the Interior is satisfied that said adult full-blood Indians are competent to handle their own affairs, and in such case the Secretary of the Interior shall issue to such Indian allottee a patent in fee simple upon application."

A straightforward application of this statute would indicate that Zay Zah's trust patent in 1927 actually conveyed a fee simple, thus subjecting the property to taxation from the beginning. As stated above, however, the parties are in agreement that the land was not taxable during the 25-year period from 1927 to 1952.

 Appellants' position that taxation was barred solely due to a "vested right to tax immunity" passes over the character of the taxation involved. Logic would dictate that if Zay Zah received a fee simple in 1927 by reason of the Clapp Amendment, the land would have been subject to state taxation ab initio; but if Zay Zah had received a trust patent, meaning that the land was held by the Federal government in trust for him, it would not be subject to state taxation. See, *United States v. Rickert*, 188 U.S. 432, 437, 23 S.Ct. 478, 480, 47 L.Ed. 532, 536. The vested right to be free from state taxation must derive from somewhere, and its only possible source was the trust patent itself. After all, it is the land which is exempt from property tax, not the individual who happens to own or possess the land at any given time.[1] The principle established by *Rickert* is that land held in trust by the United States is exempt from state taxation during the period of that trusteeship, and none of the rights derived from the trust can be divested without due process under the Fifth Amendment.

This analysis is supported by *Morrow v. United States*, 243 F. 854 (8 Cir. 1917), wherein the Eighth Circuit resolved a matter similar to the present case. The Court of Appeals stated the issue to be—

" * * * whether or not the land of an adult mixed-blood Chippewa Indian allotted, patented, and held under the provisions of the Nelson Act (January 14, 1889, 25 Stat. 642) is, since the enactment of the so-called Clapp Amendment (June 21, 1906, c. 3504, 34 Stat. 353), subject to state and local taxation, where the allottee has never attempted to avail himself of any power he might have under that amendment to alienate or incumber, but on the contrary is insisting upon holding

1. This principle is clearly stated by the Supreme Court in *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912), a case involving Oklahoma Choctaw and Chickasaw Indians holding tax-exempt lands under trust patents. Referring to the language in the Curtis Act, the act pursuant to which the Indians had received their patents, 30 Stat. 495, 507, that "all land shall be non-taxable," the court stated that this "naturally indicates that the exemption is attached to the land—only an artificial rule can make it a personal privilege." 224 U.S. 675, 32 S.Ct. 569, 56 L.Ed. 946.

it according to the provisions of a trust patent issued under the authority of the Nelson Act." 243 F. 855.

The positions taken by the parties were these:

"Appellants properly concede that there was no right of taxation while the land was held solely under such trust patent. They contend that the Clapp Amendment enacted four years subsequent to the issue and during the life of this trust patent had the effect of terminating it and of vesting a complete fee title in the allottee irrespective of his consent to such a change. An answering contention of the government is that Congress had no power to alter this 'trust patent' status without the consent of such patentee, because such trust patent, issued under the Nelson Act, conveyed a property right to this patentee which had become vested. The property right intended being the separate beneficial use of the land free from taxation and involuntary alienation for 25 years from date of trust patent, with fee title thereafter." Ibid.

The court began its analysis as follows:

"[1] There is no question that the government may, in its dealings with the Indians, create property rights which, once vested, even it cannot alter. *Williams v. Johnson*, 239 U.S. 414, 420, 36 Sup.Ct. 150, 60 L.Ed. 358; *Sizemore v. Brady*, 235 U.S. 441, 449, 35 Sup.Ct. 135, 59 L.Ed. 308; *Choate v. Trapp*, 224 U.S. 665, 32 Sup.Ct. 565, 56 L.Ed. 941; *English v. Richardson*, 224 U.S. 680, 32 Sup.Ct. 571, 56 L.Ed. 949; *Jones v. Meehan*, 175 U.S. 1, 20 Sup.Ct. 1, 44 L.Ed. 49; *Chase v. U.S.*, 8 Cir., 222 F. 593, 596, 138 C.C.A. 117. Such property rights may result from agreements between the government and the Indian. Whether the transaction takes the form of a treaty or of a statute is immaterial; the important considerations are that there should be the essentials of a binding agreement between the government and the Indian and the resultant vesting of a property right in the Indian.

"[2] That exemption of land from taxation is a property right is established. *Choate v. Trapp*, supra. That this Indian had taken possession of and was enjoying this land under such an exemption at the time the Clapp Amendment was passed is undisputed. Therefore, if this exemption came to him as a legal right, it had fully vested. It came as such legal right if it rested on the solid basis of a binding agreement. If there was such an agreement here, it is to be found in the terms of the Nelson Act, read in the light of attendant circumstances." 243 F. 856.

The court held that exemption from taxation was one of the rights intended to pass with the trust patent under the Nelson Act:

"A trust patent in exact compliance with such understanding and agreement was issued this Indian, and under it he has taken and holds this land. His rights are vested and are impervious to alteration against his will except through the sovereign power of eminent domain. One of these rights was freedom from state and local taxation." 243 F. 858.

The only distinguishing factor between the present case and the *Morrow* case is that in *Morrow*, the trust patent was issued prior to the passage of the Clapp Amendment, while in the present case the patent was issued approximately 20 years after the Clapp Amendment.

This fact fails to distinguish *Morrow* since appellants admit that Zay Zah's property was not taxable from 1927 to 1952, because there was a "vested right to tax immunity" during this period. As made clear in *Morrow*, this exemption is derived directly from the trust patent itself:

"The instant case is not one depending upon governmental wardship over a dependent and inferior people, but is based upon the legal relation of trusteeship, and springs from the obligation contained in the terms of the trust to preserve the land, so that at the end of the trust period it can be passed to the beneficiary 'free of all charge or incumbrance.'" 243 F. 859.

If the Clapp Amendment was ineffective to destroy the tax exemption during this period, it must also have been ineffective to destroy the legal source of that exemption, namely, the trusteeship established by the patent. The court in *Morrow* viewed the trust patent as a "binding agreement," which vested in the patentee the property right to "separate beneficial use of the land free from taxation and involuntary alienation for 25 years from date of trust patent, with fee title thereafter." 243 F. 856. This language, when viewed in light of the trust patent itself, makes clear that the tax-exempt status of the land covered by the patent was derived from the trusteeship itself, and could not be lost unless the trust itself was terminated. The holding of *Morrow* is that the Clapp Amendment does not terminate the trust, thus it could not create a fee simple title subject to taxation.

This court followed the *Morrow* decision in *Warren v. County of Mahnomen,* 192 Minn. 464, 257 N.W. 77 (1934), a case similar on its facts to *Morrow.* In *Warren* we stated:

"That, during the determinative period, plaintiff's land was exempt from taxation is clear. The precise point is determined for him by *Morrow v. United States* (8 Cir.) 243 F. 854, 859. The decision was not based 'upon governmental wardship over dependent and inferior people' but rather was put upon '*the legal relation of trusteeship*' between the federal government, as trustee, and the Indian allottees as beneficiaries. The resulting obligation, preventing taxation during the continuance of the trust, '*springs from the obligation contained in the terms of the trust* to preserve the land, so that at the end of the trust period it can be passed to the beneficiary "free of all charge or encumbrance." ' " 192 Minn. 465, 257 N.W. 78. (Italics supplied.)

Although *Warren* similarly involved a trust patent issued prior to the Clapp Amendment, this again will not serve to distinguish it from the present case.

■ The case of *Mahnomen County v. United States,* 319 U.S. 474, 63 S.Ct. 1254, 87 L.Ed. 1527 (1943), does not require a different interpretation of the Clapp Amendment. That case also involved a trust patent issued prior to the Clapp Amendment, but dealt with a somewhat different question, whether a county had to refund property taxes assessed by the county and paid by an Indian during the period of a trust patent. In holding that the taxes need not be refunded, the United States Supreme Court made the following remarks concerning the effects of the Clapp Amendment:

"Notwithstanding these acts the County concedes, and we assume arguendo, that it was without power to impose a tax upon these allotted lands prior to 1928 against the consent of the Indians. *Choate v. Trapp,* 224 U.S. 665 [32 S.Ct. 565, 56 L.Ed. 941]. The Clapp Amendment gives the consent of the United States to state taxation, thus removing the barrier to taxation found to exist in *United States v. Rickert, supra* ; but under *Choate v. Trapp* the Indian, who has gained a 'vested right' not to be taxed, must also consent." 319 U.S. 476, 63 S.Ct. 1256, 87 L.Ed. 1530.

The Clapp Amendment is thus seen to have the effect of permitting Indians covered by its terms to convert their trust patents, whether issued before or after the passage of the Amendment, into fee simple titles subject to taxation. Nevertheless, once the trust patent has been issued, it cannot be so converted without the consent of the patentee. The binding trust agreement continues in full effect, with its attendant tax exemption, until its term expires or the patentee accepts title in fee simple. This reading of the Clapp Amendment is fully consistent with *Morrow v. United States, supra,* and *Warren v. County of Mahnomen, supra.*

In the instant case it is undisputed that Zay Zah took no action to convert his trust patent into a fee simple as permitted by the Clapp Amendment. The trust created in 1927 therefore continued in full effect until 1952; the freedom from taxation during that period being derived from the "legal

relationship of trusteeship" established by the patent.

Under the terms of the trust patent Zay Zah's land would have become his in fee simple in 1952, thereafter fully subject to state taxation. Respondents assert, however, that the Wheeler-Howard Act, 25 U.S. C.A., § 462, extends Zay Zah's trust patent indefinitely. Since Zay Zah's trust patent was in existence at the time of the Wheeler-Howard Act, § 462 must be interpreted as extending the trust period unless contrary considerations can be found. Appellants admit that "read alone, the Wheeler-Howard Act would seem to extend indefinitely the trust period and restrictions placed on any Indian land."

Appellants' principal argument against such extension is that the mixed-blood Indians of the White Earth Reservation were "fully emancipated by virtue of the Clapp Amendment." They cite the following cases to support their argument: *United States v. Waller*, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843 (1917); *Dickson v. Luck Land Company*, 242 U.S. 371, 37 S.Ct. 167, 61 L.Ed. 371 (1917); *Baker v. McCarthy*, 145 Minn. 167, 176 N.W. 643 (1920); and *United States v. Spaeth*, 24 F.Supp. 465 (D.C.Minn. 1938). However, the first two cases were explicitly distinguished in the *Morrow* decision:

"The court has not overlooked the decisions in *Dickson v. Luck Land Co.* (1917) 242 U.S. 371, 37 Sup.Ct. 167, 61 L.Ed. 371, and *United States v. Waller* (1917) 243 U.S. 452, 37 Sup.Ct. 430, 61 L.Ed. 843. In the *Dickson* case the only question was whether, in a suit between rival grantees of land allotted and patented to a mixed-blood Chippewa Indian in the White Earth Reservation, and by him conveyed, the issue of the patent (not a trust patent) was conclusive as to the adulthood of the Indian at the time of its issue. There the Indian had fully availed himself of the terms of the Clapp Amendment, had secured a patent thereunder, and had alienated his land. The suit in this court is based upon refusal of this Indian to change his status by acceptance and exercise of the powers offered in the Clapp Amendment. In the *Waller* case the question was whether the government could properly bring a suit to set aside conveyances of land by mixed-blood Chippewa Indian allottees on the ground that the conveyances had been fraudulently obtained. The court held the government was not a proper party because the wardship of the government had been, in respect to their lands, removed from such Indians by the Clapp Amendment. The court says:

"'The act thus evidences a legislative judgment that adult mixed-blood Indians are, in the respects dealt with in the act, capable of managing their own affairs, and for that reason they are given full power and authority to dispose of allotted lands.'" 243 F. 858.

In both these cases, the Indian patentees had voluntarily chosen to alienate their lands as permitted by the Clapp Amendment, but neither case addresses the issue in the present case, where the Indian patentee wishes to retain the trust status of the land.

The case of *Baker v. McCarthy, supra,* involved the sale of land held under a trust patent by the heirs of the original patentee. In that case this court held the sale valid, taking the following view of the Clapp Amendment:

"* * * We think it is the general view that the issuance of a fee-simple patent operates, by implication, to emancipate the Indian from Federal guardianship and jurisdiction. *Luck Land Co. v. Dickson*, 132 Minn. 396, 157 N.W. 655, affirmed 242 U.S. 371, 37 Sup.Ct. 167, 61 L.Ed. 371. We hold that the same result was accomplished by the provision of the Clapp amendments converting the trust deeds theretofore issued in the case of adult mixed-bloods into instruments of fee-simple title, see *United States v. Waller*, 243 U.S. 452, 37 Sup.Ct. 430, 61 L.Ed. 843 * * *." 145 Minn. 170, 176 N.W. 644.

If controlling, such language would make the Wheeler-Howard Act totally inapplica-

ble, since by this analysis Zay Zah, being an adult mixed-blood Indian in 1927, would have held a fee simple from the issuance of the "trust patent." The *Baker* decision, however, cannot be reconciled with our later decision in *Warren v. County of Mahnomen, supra.* The *Warren* case clearly holds that land held under a trust patent is exempt from taxation, relying upon the *Morrow* case as noted above. Further, in *Warren* we explicitly noted the importance of no fee simple patent having been issued:

"* * * That conclusion [i.e., the *Morrow* holding of nontaxability based upon 'trusteeship' between the Federal government as trustee and the Indian allottees as beneficiaries] is especially applicable here because the fee patent had not been delivered, and plaintiff had made no application for its issue." 192 Minn. 466, 257 N.W. 78.

The "trusteeship" theory of *Warren* and *Morrow* cannot be squared with the "automatic fee simple" theory of *Baker.* Therefore, the district court was not in error to conclude that *Warren* "overruled *Baker*, at least by implication."

The final case relied upon by appellants to show the ineffectiveness of § 462 of the Wheeler-Howard Act is *United States v. Spaeth*, 24 F.Supp. 465 (D.C.Minn.1938). The issue in *Spaeth* was whether Executive Orders of 1920 and 1927 had extended trust patents of Indians who were affected by the Clapp Amendment. The factual situation was somewhat unusual in that all but two of the Indians involved had received fee title patents from the government, though they had not requested such patents. The court in *Spaeth* stated:

"The removal of the restriction of alienation, however, does not necessarily interfere with or imperil the immunity from taxation. That is a vested right. But while it was necessary to obtain the Indian's consent to divest him of the guaranteed non-taxable land during the twenty-five year period, it was not necessary to obtain his consent to clothe him with authority to alienate his land. In some instances, it may have been a distinct benefit to the Indians to be able to give fee title. Presumably, Congress determined that adult mixed-blood Indians on the White Earth Indian Reservation were capable of self-management so far as their lands were concerned. That the Government recognized the plain intendment of the Clapp Amendment is reflected by the action of the Department in issuing fee patents to the adult mixed-blood White Earth Indians." 24 F.Supp. 468.

The court summarized, "A title tantamount to fee by reason of legislative enactment [i.e., the Clapp Amendment] existed in the allottee." The Executive Order could thus not extend a trust because "the President did not intend to extend something that did not exist." Ibid. The court concluded with the following remarks:

"* * * Whatever effect this order may have must be limited to the full bloods, because the Clapp Amendment divested the United States of any title to lands of the adult mixed bloods. The whole and complete title by virtue of that amendment passed from the United States to the Indians. Clearly, therefore, the Executive Order had no effect on the lands in question—the Government admits as much.

"The twenty-five year period has now expired. The contract with the Indians to deliver their fee title at the expiration of this period 'free of all charge and incumbrance whatsoever' has been fulfilled. The assurance given to these Indians when the Nelson Act and General Allotment Act were discussed with them that their lands would not be taxed for twenty-five years has been made good. The vested right has terminated. The lands are not only free from any restriction of alienation, but they must now bear their fair share of the taxable burden. It is the Court's view, therefore, that all of the lands referred to in the stipulation are exempt from taxation for a period of twenty-five years from the date of the trust patent and no longer." 24 F.Supp. 469.

As discussed above, this reasoning is not consistent with the "trusteeship" basis for tax exemption explained in *Morrow*. Commenting upon the *Spaeth* decision, the district court in the instant case noted in its memorandum:

> "The basic flaw in [the reasoning of the Federal District Court in *Spaeth*] is apparent. If fee title vested immediately on passage of the Clapp Amendment, the land would be subject to *immediate* taxation. However, the Court, nevertheless, ruled that the tax exemption continued until the end of the 25-year trust, just as conceded by the plaintiffs in the case under consideration. By so ruling, the Court's language relative to the inefficacy of the extension orders robs the case of any real authority, especially in view of *Morrow*, not cited nor recognized by [the Court], even though decided by the 8th Circuit." (Emphasis original.)

There is simply no way to reconcile the granting of a fee simple via a trust patent with a vested right to tax immunity under that same patent. While it is undoubtedly true that the Clapp Amendment "emancipated" certain Indians to the extent that they could, if they wished, obtain fee title to their lands and then be required to pay taxes thereon, it could not at one and the same time automatically make trust patents into fee patents and yet maintain the tax-exempt status of the land. This status, admittedly not destroyed by the Clapp Amendment even as to trust patents issued subsequent to its passage, can only arise from the fact that the land was indeed still held in trust by the Federal government under a binding agreement with the White Earth Indians. The district court therefore correctly held that the decision in *Spaeth* is not consistent with the holding of *Morrow v. United States, supra,* which we accepted in *Warren v. County of Mahnomen, supra,* and affirm herein.

■ We conclude that the trusteeship agreement between Zay Zah and the United States did not terminate in 1952, but was rather extended indefinitely by the Wheeler-Howard Act of 1934. It follows that the tax-exempt status of this land, derived as it was from the trust agreement, did not terminate in 1952, and hence the land did not become subject to forfeiture for nonpayment of taxes. Equitable title under the trust remained in Zay Zah, and has now passed to his sole heir George Aubid, Sr.; fee title remains in the United States unless and until the holder of the trust patent applies for and obtains from the United States a fee patent. We reach this result based solely upon the facts of this case. We intimate no opinion as to what might be the result in a different factual setting such as, but not limited to, a situation where title to former trust patent property has already been quieted.

Affirmed.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

YETKA, Justice (concurring specially).

Although I must concur in the result reached in this case, I believe that it contributes to the still unresolved problems which are the product of shifting Federal policies towards Indian tribes. I am particularly concerned with the specific result in the present case, because there is no accurate estimate of the number of titles and amount of land affected. The attempt to limit this decision narrowly to its facts cannot be wholly successful. Its reasoning is bound to be persuasive in cases involving other land titles, even where title has already been quieted. This possibility raises serious due process considerations which were not before us in the present case but are just below the surface.

In *Bryan v. Itasca County,* 303 Minn. 395, 406, 228 N.W.2d 249, 256 (1975), reversed, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), we expressed misgivings about the twists and turns of Federal policy toward Indians as follows:

> "It has been the Federal government, though its vacillation in determining the best course to follow for over 100 years,

that has led to the present confusion, including the issues raised by this lawsuit. The government first appears to move toward termination and assimilation, then to retreat from those objectives, and retrenches, this indecision has resulted in a great deal of confusion."

The fact that the statutory interpretation espoused by this court was ultimately incorrect only serves to highlight those misgivings.

The passage in 1953 of Public Law 280, 67 Stat. 583,[1] as amended, 18 U.S.C.A., § 1162, and 28 U.S.C.A., § 1360, marked the beginning of the most recent assimilation policy toward Indians, but as suggested in *Bryan v. Itasca County*, 426 U.S. 373, 387, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710, 720 (1976), that policy is not as strong today, if it ever was a *total* assimilationist policy.[2] It appears now that the Federal government wishes to preserve Indian culture and strengthen tribal self-government.

The state's dilemma in the present situation is clear from an examination of Public Law 280 and the present case. Since jurisdiction has been asserted by the state over criminal and civil matters on most reservations, there is an increased need for services and personnel. However, removal of additional lands from taxation, as in the present case, shrinks the tax base which provides funds for the services. If, as suggested by the United States Supreme Court in *Bryan*, extension of state taxing power would cripple tribal self-government, and if as suggested by the present opinion state and local power to tax Indian-owned lands is more restricted than previously supposed, the state and local tax burdens will be even greater. If Federal policy contemplates strengthened tribal government (cf. *Bryan v. Itasca County*, 426 U.S. 373, 388, note 14, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710, 721)

with reliance on state and local governments to provide services that would otherwise be unavailable, then the Federal government must accept the financial responsibility for providing the services.[3] If states cannot tax tribal property on the reservation or lands allotted to individual Indians, they must be reimbursed for providing services on the reservations. The existence of this dilemma has been recognized since the passage of Public Law 280 (see, colloquy between Congressman Young and Chief Counsel Sellery of the Bureau of Indian Affairs, quoted in *Bryan*, 426 U.S. 381, 96 S.Ct. 2108, 48 L.Ed.2d 717).

Taxation is not the only area of uncertainty in Federal Indian policy. One commentator has noted generally with regard to the status of all Indian treaty rights the following:

"Unfortunately, the body of law protecting basic Indian treaty rights is in evident disarray. There are so many tests for determining whether an abrogation has been effected, and most of them are so vague, that a court has little recourse but to arrive at an ad hoc, almost arbitrary decision when faced with the question of whether a particular treaty guarantee has been abrogated by Congress." Wilkinson and Volkman, "*Judicial Review of Indian Treaty Abrogation: 'As Long as Water Flows, or Grass Grows Upon the Earth'—How Long a Time Is That?*" 63 Calif.L.Rev. 601, 608.

The basic point is the same as in the present case primarily because of the lack of coherent or consistent Federal policy.

The continuing uncertainty about the status of Indian tribes and land holdings can only serve to exacerbate tensions between the white and Indian communities. While property tax exemption is viewed by Indi-

---

1. Subsequently amended by 69 Stat. 795, 72 Stat. 545, and 84 Stat. 1358.

2. The General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U.S.C.A., §§ 331 to 358, was part of an earlier Federal assimilation policy which ended in 1934. See, discussion in *Kake Village v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

3. The Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C.A., § 1451 to § 1543, and the Indian Self-Determination and Education Assistance Act, 88 Stat. 2203, 25 U.S.C.A., § 450, et seq., provide funds for internal tribal development. The missing ingredient is aid for states providing services.

ans as a right deriving from special historical status and a means of strengthening cultural identity, it is viewed by whites as a privilege and a lack of fundamental fairness. This kind of problem could be solved by a consistent Federal policy exercised with more concern for its long range effects.

The Federal government has exclusive and plenary power to legislate for Indian tribes. This power is derived from several sources. U.S.Const. art. 1, § 8, provides in part that:

"The Congress shall have Power: * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

The other constitutional source from which the Federal government derives its power over Indian tribes is the treaty power found in U.S.Const. art. 2, § 2, which provides in part that:

"[The president] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties * * *."

See, Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Because of the breadth given this power by the courts the Federal government may treat Indian tribes as "wards" with special status, despite the constitutional requirement that all who are citizens be treated equally.[4] The breadth of the Federal power over Indian tribes and its resulting conflicts with equal protection theory require that the power be exercised with regard to its effect on non-Indians as well as Indians.[5]

KELLY, J., took no part in the consideration or decision of this case.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

4. The Fifth Amendment due process clause requires that the Federal government treat citizens equally, just as the Fourteenth Amendment requires the states give all citizens equal protection of the laws. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Even though the United States Supreme Court has held that equal protection and Indian preference are not incompatible, the problems underlying such conflicts still exist. See, Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); cf. United States v. Antelope, 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977).

5. One possible alternative is retrocession of jurisdiction to the Federal government under 25 U.S.C.A., § 1323. The result of this, however, can lead to unequal treatment of Indians and whites which nonetheless is not vulnerable to equal protection and due process attack. Retrocession would be consistent with current Federal policy and would serve to alleviate some of the financial burdens on local government. The state has taken advantage of this law in one limited instance. See, L. 1973, c. 625.