**ALLBAUGH et al. v. UNITED STATES.**

No. 13967.

United States Court of Appeals
Eighth Circuit.

Aug. 9, 1950.

Writ of Certiorari Denied Dec. 11, 1950.

See 71 S.Ct. 281.

Richard C. Peck, Plattsmouth, Neb., and G. M. Tunison, Omaha, Neb., for appellants.

John C. Harrington, Attorney, Department of Justice, Washington, D. C. (A. Devitt Vanech, Assistant Attorney General, Joseph T. Votava, United States Attorney, Omaha, Neb., and Roger P. Marquis, Attorney, Department of Justice, Washington, D.C., on the brief), for appellee.

James E. Curry, Washington, D. C. (Frances L. Horn, I. S. Weissbrodt, and Felix S. Cohen, all of Washington, D. C., on the brief), for amici curiæ Omaha Tribe of Nebraska, National Congress of American Indians, and Amos Lamson, William McKeegan, I. H. Davenport and L. C. Campbell.

Before GARDNER, Chief Judge, and THOMAS and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The United States sought to recover from the lessee of some Winnebago Indian lands and his bondsmen, as an alleged part of the rental which the lessee had agreed to pay, the taxes which had been assessed against the property by Thurston County, Nebraska, where the lands were situated. The trial court gave the United States a judgment, and the lessee and his bondsmen have appealed.

In instituting the action, the United States was acting as sovereign trustee on behalf of the individual Indian owners of the property, who held the lands under restricted trust patent allotments made to members of the Winnebago tribe pursuant to the General Allotment Act of 1887, 24

Stat. 388, 25 U.S.C.A. § 331 et seq., and who had been authorized to make leasings of such lands by the Act of March 3, 1921, 41 Stat. 1225, 1232, 25 U.S.C.A. § 393.

The leases that are here involved covered the years 1935, to 1942, inclusive, except 1936. All of them were executed, after advertisements by the Superintendent of the Winnebago Agency for rental bids, upon forms provided by the Secretary of the Interior for that purpose.

The form contained clauses as follows:

"The lessee, in consideration of the foregoing [leasing of the property to him], covenants and agrees to pay $.......... per acre per year to the Superintendent of the Winnebago Agency as rental for said land and premises * * *. All rentals not paid when due will draw 7 per cent interest from that date."

"The lessee agrees to pay all taxes assessed against the land during the term of the lease promptly when due, and to send the receipts therefor to the Superintendent, who will credit the amount on the rental, the balance to be paid as specified above."

In each of the leases prior to its execution, the blank space of the first clause quoted, intended for a recital of the rental consideration, was made to contain a statement of the cash amount to be paid and the words "plus taxes" or "and taxes." Thus, as an illustration, and as typical of all the leases, the clause in the first lease that is involved, upon execution, read: "The lessee, in consideration of the foregoing, covenants and agrees to pay $2.50 plus taxes per acre to the Superintendent of the Winnebago Agency as rental for said land and premises * * *."

Taxes that became due during each of the years covered by the leases had been assessed against the lands by Thurston County, Nebraska, in conformity with the state statutes. The assessing of such taxes under the statutes of Nebraska was authorized by the Brown-Stephens Act, Public Law 291 of December 30, 1916, 39 Stat. 865, which in so far as here pertinent, provided:[1] "That all of the lands in the State of Nebraska belonging to the members of the tribe of Winnebago Indians held under trust patents of allotments, and upon which the twenty-five-year trust period shall have expired, or shall expire, and which trust period shall have been or shall be extended as provided by law, shall be, and the same are hereby, * * * made subject to taxation for local, school district, road district, county, and State purposes, as provided by the laws of the State of Nebraska now in force or to be hereafter enacted. * * * Provided, That any of the lands * * *, so long as the same shall be held under trust patents, shall not be subject to levy and tax sale, as provided under the laws of the State of Nebraska, for the collection of such taxes; but if such tax shall not be paid within one year after the same shall become due and payable, as provided by the laws of the State of Nebraska, then the list of such unpaid and delinquent taxes on the lands of the Winnebago Indians * * *, as above provided, shall be certified by the county treasurer of the county in which such lands are situated to the Secretary of the Interior, who shall be authorized to pay the same from any funds belonging to the Indian allottees owning such lands so taxed and arising from the rentals thereof or under his control; and in the event that no funds shall be in the possession or under the control of the Secretary of the Interior, he shall certify that fact to the said county treasurer, which certificate shall operate as a full release and discharge of the tax assessed against the land of the Indian so without funds."

1. The purpose of the Brown-Stephens Act was primarily to alleviate the situation which existed in Thurston County from about one-half of its realty being at the time tax-exempt Indian lands. House Report No. 1098, 64th Congress, 1st Session, p. 3. See also Senate Report No. 397, 61st Congress, 2nd Session, p. 3, where the view previously had been expressed that "the increase in the value of the Indian lands themselves, growing out of better roads, better schools, and more effective administration of local affairs, which would be made possible by the larger income to the county will very much more than equal the sum total of taxes which will be paid by the Indians."

Appellants conceded that the lands involved were within the operation of the Brown-Stephens Act, if that Act was not invalid. Also, the parties stipulated that the taxes sued for had not been paid to Thurston County by anyone, and neither had the County Treasurer certified such taxes to the Secretary of the Interior for payment, nor had the Secretary of the Interior executed any certificate which would release and discharge the assessments under the Brown-Stephens Act.

The only contentions for reversal that call for consideration here are in substance (1) that the taxes did not constitute a part of the rental for the property, but the lessee's obligation was simply a separate covenant to pay taxes on which there could be no recovery for the use and benefit of the lessors in the present situation, since the lessors had in no way been damaged by the breach; (2) that beyond this, since the right to assess such taxes had been created by the Brown-Stephens Act, the remedy of certification, etc., which the Act provided for their collection, necessarily was exclusive, and no court therefore would have jurisdiction of any action to collect; and (3) that the Brown-Stephens Act was in any event unconstitutional, so that any taxes assessed by its authority were invalid, and hence there existed no taxes in fact for the lessee to pay.

■ Appellants' first contention fails generally, of course, if the trial court was correct in holding that the taxes (assuming their legality) were a part of the rental itself which the lessee had agreed to pay for occupancy of the premises. By long-settled principles of landlord and tenant law, where a lessee has agreed to pay taxes as rental and does not make payment of them to the proper public authority when they are due, the amount thereof becomes a debt owing to the lessor and is collectible as such, like any other delinquent rent. See 32 Am.Jur., Landlord and Tenant, § 293, pp. 272, 273. And the Act of March 3, 1921, 25 U.S.C.A. § 393, permitting Indian allottees to lease their lands, or the rules and regulations prescribed by the Secretary of the Interior under the Act contain nothing that can be said to preclude thus making authorized taxes a part of the rental and allowing them to be collected as such, as a means of facilitating or effectuating the purposes of the Brown-Stephens Act when the lessee does not make payment of them in the normal manner and so causes them to become delinquent.

■ We agree with the trial court that the language of the leases here clearly made the taxes a part of the rental. Since we are unable to accept appellants' contention that the lessee's obligation was only a covenant to pay taxes, we need not examine the soundness of their corrollary argument that the lessors could not claim in the present situation to have suffered any damage from the breach of such a separate covenant, because they had made no payment themselves of the taxes and were without any obligation to do so and could not have their property charged with a lien therefor.

Under the first of the two lease-clauses which we have quoted above, it was expressly provided that the lessee should pay "$2.50 [or other stated cash amount] plus taxes per acre to the Superintendent of the Winnebago Agency as rental for said land and premises." The second clause quoted provided that the lessee should make payment of such taxes promptly to the County Treasurer when due, but it specifically preserved the aspect of such payments as rent pursuant to the first clause, by requiring the lessee to send the receipts to the Superintendent, "who will credit the amount on the rental." On its very face, all of this, it seems to us, could reasonably have but one legal meaning: The leases unequivocally made the rental consist of a cash amount plus taxes; the taxes when due were for convenience to be paid by the lessee to the County Treasurer and the receipts sent to the Superintendent to enable the latter to "credit the amount on the rental;" and the lessee's failure so to pay the taxes left this portion of the rent as delinquent, for which under the settled law of landlord and tenant the lessors had the right to sue and recover in debt. Thus the situation was

not one where, as in Lamoine Mott Estate v. Neiman, 8 Cir., 77 F.2d 744, 747, 99 A.L.R. 1097, on which appellants rely, the taxes could be said not to have been "included generally within the term rent," but was, on the language used in the rental clause, one to which the views expressed in Britton v. Western Iowa Co., 8 Cir., 9 F.2d 488, 491, 45 A.L.R. 711, and Miles Corporation v. Lindel, 8 Cir., 107 F.2d 729, 730, 731, had application.

Nor do we think any ambiguity could possibly be said to have existed in the leases as executed from the fact that the Superintendent's advertisements for bids had not specifically declared that the taxes were to constitute a part of the rental but merely stated: "Bids will be received for cash, plus taxes. The taxes are to be paid direct to the County Treasurer and the tax receipts filed in the Agency office." On this language, the provision for payment of taxes in the leases to be executed could no doubt have been drawn up as either a rental obligation or a separate covenant to pay taxes, but so far as appellants' rights are here concerned that negotiative question ceased to have existence when the lessee signed written leases which clearly and expressly made the taxes "rental," and against which no right of reformation is claimed.

Again, the mere fact that the Superintendent's records unexplainedly contained no entry in them of the amount of the unpaid taxes and interest, but did of the fixed cash payments which became delinquent, was not required to be regarded by the trial court as an intention on the part of the Superintendent to treat the taxes as non-rental, and in any event this circumstance would not be required to be accorded any legal significance against the unequivocal language of the contract or as being related in recognition to some position assumed by the lessee during an attempted performance. The same is true of the circumstance that the Superintendent unexplainedly had allowed the lessee to make renewals of the leases for subsequent years, when his advertisements for bids had stated that "Lessees and bondsmen whose rentals are delinquent will not be entitled to preference rights."

As we have suggested, these two unexplained circumstances, either singly or collectively, did not compel the view that the Superintendent's acts had involved any intended construction, and in any event there was in them no controlling legal effect. The taxes may not have been entered as delinquent rent and may not have been taken into account in making lease renewals, possibly because the Superintendent simply overlooked the matter, or perhaps because he assumed, without checking with, and in the absence of any certification by, the County Treasurer, that the taxes had been paid. And the subsequent leases may not in fact have been granted as preference rights, but because the lessee had been the sole or highest bidder. Whatever was the actual situation, on none of the contingencies possible does the record directly speak, so that one conclusion cannot as a matter of law be said to be compelled above the other.

But even beyond this, whether the Superintendent's actions were impelled by any attempted construction on his part or not, they did not occur under circumstances that would make them legal absolutes in relation to the lessee's obligation. There had been no assertion of a position by the lessee in some dispute or in an undertaken performance, of which they could be claimed to be a legal recognition. The question of the nature of the lessee's obligation did not come up between the parties in controversy or in discussion or in any other manner while the leases were in effect. And there certainly had been no performance position assumed by the lessee of which the Superintendent's acts could be claimed to be an acceptance or a recognition, for whether the lessee's obligation was as rental or as a covenant to pay taxes, he had made no attempt and had no willingness to perform it on either basis.

Thus, and without need to consider the other elements urged by the United States in respect to the Superintendent's acts, that might also perhaps have significance

against appellants' contention, it may be repeated that the actions relied upon by the lessee cannot here be declared to have been of such a nature or under such circumstances as required the trial court to accord them any legal significance. The definite and unambiguous language of the contract, as has been pointed out, was on its face without any need or room for interpretation, and if in this situation an artificial interpretation could nevertheless have become binding through a mutual adoption, there was involved here no resolving of any dispute or recognition of some assumed performance position or other equivalently affecting circumstance that might have tended to give it such a significance.

Appellants' second contention, that no suit to recover the taxes involved could be maintained because the Brown-Stephens Act did not provide for such a remedy, calls for only a passing comment. The implied exclusiveness as a remedy of the means provided in tax statutes for collecting taxes is universally treated as having application only to the actions of tax-collecting authorities. They do not prevent parties from making agreements dealing with taxes as rental or other form of contract obligation and from being entitled to resort to the traditional remedies of the law for vindication of the rights created between them. These principles are too well established to require any further consideration.

The final contention made is that the Brown-Stephens Act is unconstitutional and any taxes assessed by its authority would therefore be invalid and so there never existed any taxes for the lessee to pay. The premise underlying appellants' argument is that Indian lands, as a matter of cessation, treaty and allotment rights, are entitled to immunity from any taxation, so long as they are held under trust patents. This proposition is said to be definitely established by Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941, as well as by cases in the Circuits, such as Morrow v. United States, 8 Cir., 243 F. 854; United States v. Benewah County, Idaho, 9 Cir., 290 F. 628; Board of Com'rs of Caddo County, Oklahoma v. United States, 10 Cir., 87 F.2d 55; United States v. Nez Perce County, Idaho, 9 Cir., 95 F.2d 232; and Glacier County, Montana v. United States, 9 Cir., 99 F.2d 733.

The United States in turn argues inter alia that whatever vested right may have been created generally in favor of an Indian under a restricted trust allotment to the immunity of his land from taxation endures only for the initial period of such trust and does not as a matter of course carry over to a subsequent extension thereof (as here), unless it is made to do so by some provision of law or agreement existing in the particular situation; that in the case of the Winnebago allotments there was no such obligation by law or agreement as could be claimed to have carried over any original tax immunity to extensions made of the trust period, and hence the only duty owed by the United States to an allottee upon the making of an extension was to be in position upon its expiration and a termination of the trust to furnish the allottee with a fee title to the land, "free of all charge or incumbrance whatsoever," 25 U.S.C.A. § 348, with which right of the allottee to a clear title the authorizing by the Brown-Stephens Act of non-lienable taxes could in no way interfere; that even if it were possible to claim that such taxes could not properly be paid out of an allottee's funds without his consent, the allottee could at least voluntarily make such payments or consent to the Secretary of the Interior's doing so, and therefore he also necessarily was entitled to make provision for payment by an obligation on the part of his lessee to do so; that to the extent that the constitutionality of the Brown-Stephens Act might at all require consideration in the present situation, the Act could accordingly not be regarded as being invalid; and that in any event the constitutionality of the Act was not a question which appellants had any standing in the situation to raise.

Whether or not, if an extension of an original tax-immune trust period has been made under the provisions of the General Allotment Act, 25 U.S.C.A. § 331 et

seq., and is in effect, Congress can validly during the period of the extension authorize the assessing and collecting in any form of local taxes upon an allottee's land without his consent, there at least can be no doubt that it would have the right in any such situation to permit assessments to be made which were non-lienable and non-obligational and to provide for their payment out of funds in the Government's hands or control, if the allottee was willing that such payments be made. Only lack of consent could violate any vested right to tax immunity that an allottee might have. And the power of Congress to allow such a consent to be given or the right of the Indian in that situation so to act is not open to question. Cf. Mahnomen County, Minnesota v. United States, 319 U.S. 474, 63 S.Ct. 1254, 87 L.Ed. 1527.

█ If the Brown-Stephens Act therefore in its effect amounts to nothing more than a congressional sanction for the making and paying of tax assessments, with an implied right in the allottee to permit such payments to be made in any case where his consent might be necessary to avoid violating a vested right, there can be no possible basis for any contention of invalidity in the present situation. The provision made by the allottee in the lease that the lessee should pay the taxes manifestly constituted a consent to their payment from that source at least, in so far as the allottee would be capable of giving the consent. And bearing in mind the indicated view of Congress that to have such taxes paid would be for the welfare and advantage of the Indian, it is not unreasonable to treat the Act as implying that, if payment of the taxes might in any way violate a vested right unless the Indian consented, he was at liberty to give his approval to enable this to be done.

█ But if the Act is not entitled to be read as implying an emancipation to give consent, should this be needed, appellants' contention of unconstitutionality still does not require further consideration, for in that event the situation here does not even approach the threshold to that question. The parties are in agreement that the assessments involved do not constitute either a lien on the land or a personal obligation on the part of the Indian and also otherwise have no legal enforcibility on the part of Thurston County. No violation of vested right therefore could possibly occur except as there might be an attempt to make payment of the assessments out of the allottee's funds. Until this should be done or threatened, the question of violation of vested right would hardly be ripe for testing, since in view of the fact that, as indicated, the parties are in agreement that the assessments created no lien and gave rise to no other legal hold, the mere act of assessing could not constitute a legal injury. And whether any right would be violated if the Superintendent ever should undertake on the basis of the authority given him by the Act to make payment of such assessments out of the allottee's funds generally and without regard to consent is not a question that appellants would have standing to raise for the Indian even at that time—and certainly not prematurely and collaterally as here. No one may challenge the constitutionality of a statute unless, and until, and except in the respect that, he is directly and adversely affected thereby. Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078.

Requiring appellants to fulfill their obligation of paying the assessments as additional rental does not bring into play the question of whether an allottee may have a vested right as a matter of tax immunity to not have his general funds diminished through a use of them by the Superintendent to pay such taxes without his consent. If any invalidity could exist in the Act in that respect, it would not destroy the foundation for a payment of the assessments in a manner not violative of the vested right, such as by a legally voluntary payment or by a contractual obligation on the part of another to pay which was not diminishive of the allottee's returns from the property.

What has been said is sufficient, we think, to dispose of appellants' contentions. To

116

assure, however, that the judgment will serve its intended and inherent purpose under the Brown-Stephens Act, some further expression is perhaps desirable. There is the inducement also that on the argument of the appeal the United States did not wish to commit itself on what it intended to do with the recovery. What is hereafter said will eliminate any need for official hesitation as well as avoid any circuity and delay in accomplishing the purposes of the Act.

In holding above that an allottee may properly as a matter of legal form make taxes authorized by the Brown-Stephens Act a part of the rental, it will be noted that we added the qualification, "as a means of facilitating or effectuating the purposes of the Brown-Stephens Act." This qualification is necessarily implicit in any resort to and use of the Act. Congress intended the Act to be an instrument for bringing revenue into the treasury of Thurston County, as a means of furthering the welfare and advantage of the Indian allottees and of benefitting their properties. Except in relation to the Act and its object, the term "taxes" would legally have been without meaning or significance in the leases involved, and there would have been nothing here to recover. Without the Act; "taxes" had no existence.

Since the recovery thus was dependent upon the Act for its form and content, that recovery inherently must be regarded as being subservient to the Act's purposes. Technically and formally, of course, the recovery right is the allottee's but congressional intent and public interest under the Brown-Stephens Act are entitled to be regarded as importing an obligation in the nature of a trust to use that recovery only for the Act's purposes. The existence of the Act and its relationship to the recovery sought create factors that are not involved in the ordinary situation of a recovery of taxes by a landlord as rental.

To make this implicit obligation effective in the present situation, the judgment entry made by the trial court will be modified by adding thereto the following: "Any payments made by any of appellants on this judgment or any amounts collected by the Marshal on a writ of execution thereon shall be paid into the office of the Clerk of the Court to enable payment of the taxes covered thereby to be made to Thurston County, Nebraska, and the purpose of the Brown-Stephens Act to be thus effectuated. The funds so received, after deduction of any accrued costs, will be paid to the Treasurer of Thurston County, Nebraska, upon a general and standing application, filed herein by the County Attorney of such County in its behalf, to have such proceeds in the Clerk's hands paid to the County as they may be received from time to time, until the judgment herein shall have been fully satisfied. Such application shall be made within 60 days after the judgment herein shall have become final, but, if not so made, the Court reserves jurisdiction nevertheless to permit the application to be made thereafter for cause shown. Upon full payment or collection of the amount of the judgment and costs, the Court will enter an order releasing and discharging the judgment of record."

This course of action will relieve the United States and the Superintendent of the Indian Agency of concern and responsibility for the application of the proceeds. It will not deprive the Indian allottees of any funds which would be coming to them except for the intervention of the Brown-Stephens Act, since, as has been emphasized, without the Act there would have been no such thing as taxes to constitute additional rental or to be recovered as such. And the allottees, through the United States as their trustee and guardian, having availed themselves of the Act to recover the taxes provided for therein, would not be in a position to assert any invalidity in the Act from a use of the recovery for the only purpose for which the Act could be said to have permitted it to be obtained.

The judgment is accordingly modified, as indicated above, and, as so modified, it is Affirmed.

GARDNER, Chief Judge, concurs in the result.