**COUNTY OF THURSTON, STATE OF NEBRASKA, Plaintiff-Appellant,**

v.

**Cecil ANDRUS, Secretary of Interior, United States of America, Wyman A. Babby, Area Director, Bureau of Indian Affairs, Department of Interior, and Floyd R. Thieman, Acting Superintendent, Winnebago Agency, Bureau of Indian Affairs, Defendant-Appellees,**

**The Omaha Tribe of Indians and the Winnebago Tribe of Indians, Intervenor-Appellees and Cross-Appellants.**

**Nos. 77–1790, 77–1808.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 6, 1978.

Decided Nov. 6, 1978.

As Amended Dec. 4, 1978.

Hanson, Senior District Judge, dissented in part in footnote.

Robert G. Scoville, Ryan, Scoville & Uhlir, South Sioux City, Neb., for County of Thurston; Albert E. Maul, County Atty., Pender, Neb., on the brief.

Nancy B. Firestone, Atty., Dept. of Justice, Washington, D. C., for Cecil Andrus, Secretary of Interior, et al.; James W. Moorman, Asst. Atty. Gen., Washington, D. C., Daniel E. Wherry, U. S. Atty., Omaha, Neb., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., on the brief.

Jeanne S. Whiteing, Native American Rights Fund, Boulder, Colo., for Omaha Tribe of Indians et al.; Daniel H. Israel and Elizabeth M. Morse, Boulder, Colo., on the brief.

Before LAY and BRIGHT, Circuit Judges, and HANSON, Senior District Judge.*

HANSON, Senior District Judge.

This is an appeal from the judgment of the district court[1] in a mandamus action brought pursuant to 28 U.S.C. § 1361. Jurisdiction in this Court is predicated on 28 U.S.C. § 1291. The case involves the collection of taxes by Thurston County, Nebraska (the County) assessed on certain Indian lands held in trust by the United States under so-called trust patents of allotment for individual allottees of the Omaha and Winnebago tribes. Collection of real property taxes on the land in question is made possible under a special uncodified statute, the Brown-Stephens Act,[2] which permits

---

* The Honorable William C. Hanson, Senior District Judge for the Southern District of Iowa, sitting by designation.

1. The Honorable Albert J. Schatz, District Judge, District of Nebraska.

2. Act of December 30, 1916, Pub.L. No. 291, 39 Stat. 865. The entire Act reads as follows: *Be it enacted . . .*, That all of the lands in the State of Nebraska belonging to the members of the tribe of Winnebago Indians held under trust patents of allotments, and upon which the twenty-five-year trust period shall have expired, or shall expire, and which trust period shall have been or shall be extended as provided by law, shall be, and the same are hereby, made subject to appraisement and assessment for the purposes of taxation and subject to taxation for local, school district, road district, county, and State purposes, as provided by the laws of the State of Nebraska, now in force or to be hereafter enacted.

SEC. 2. That all of the lands in the State of Nebraska belonging to the members of the tribe of Omaha Indians now held under trust patents of allotments issued in eighteen hundred and eighty-five or subsequent thereto, and upon which the twenty-five-year trust period shall have expired, and which trust period shall have been extended, as provided by law, shall be, and the same are hereby, made subject to appraisement and assessment for the purposes of taxation and subject to taxation for local, school district, road district, county, and State purposes, as provided by the laws of the State of Nebraska now in force or to be hereafter enacted: *Provided*, That any of the lands described in section one and section two of this Act, so long as the same shall be held under trust patents, shall not be subject to levy and tax sale, as provided under the laws of the State of Nebraska for the collection of such taxes; but if such tax shall not be paid within one year after the same shall become due and payable, as provided by the laws of the State of Nebraska, then the list of such unpaid and delinquent taxes on the lands of the Winnebago Indians and Omaha Indians, as above provided, shall be certified by the county treasurer of the county in which such lands are situated to the Secretary of the Interior, who shall be authorized to pay the same from any funds belonging to the Indian allottees owning such lands so taxed and arising from the rentals thereof or under his control; and in the event that no such funds shall be in the possession or under the control of the Secretary of the Interior, he shall certify that

the County to appraise and assess the Indian land on which the original trust period has expired and been extended. If local taxes are not paid thereon within a year, the County may certify a list of unpaid taxes to the Secretary of Interior (the Secretary) who is authorized to pay the taxes from funds in his control belonging to the Indian allottee or allottees owning the land and arising from the rent of such land. Under the Brown-Stephens Act, Indian land cannot be levied against by the County and if the Secretary has no funds to pay the taxes, his certification of that fact discharges the tax liability.

Thurston County brought this action against the Secretary and other federal appellees to recover $359,598.15 in certified unpaid and delinquent taxes on trust patent lands leased to non-allottees. The taxes were due for the years 1965–1972, inclusive. The County also sought an order compelling future payments of unpaid taxes by the Secretary from rental receipts in the Secretary's control. The district court permitted the Omaha and Winnebago tribes to intervene as defendants.

After trial the district court found that the Indian allottees and their heirs had a "right to hold the trust lands as tax exempt property during the period of the trust," and could not be compelled to pay tax assessed on their land without their consent or compensation. In order to avoid constitutional difficulty, the district court viewed the Brown-Stephens Act as including an implied right to consent or object to payment of the tax assessment. The district court further held that prior to 1972 the allottees consented to taxation by providing for the payment of real property taxes by the lessee in leases of their land, and that the Secretary had a mandatory duty, enforceable through mandamus, to pay the overdue taxes. Accordingly, the district court issued a writ of mandamus requiring payment of the taxes from the Indians' present funds in the hands of the Secretary but only, however, for taxes due for 1969,

1970, and 1971 since the statute of limitations applied by the district court barred recovery for earlier years, and taxes for 1972 were unavailable because of the allottees' revocation of consent. In view of the fact that the Brown-Stephens Act did not limit actions, the district court utilized what it deemed the most analogous state rule, and held that the three-year Nebraska limitations period for liability created by a federal statute governed. See Neb.Rev.Stat. § 25–219 (Reissue 1975). The County appeals, challenging the district court's ruling that the Indians have the right to consent or object to the payment of tax assessments, and the consequent denial of tax money for 1972 and mandamus relief going to subsequent tax years. The County also argues that the district court erred in its choice of the appropriate Nebraska statute of limitations. The intervenors, the Omaha and Winnebago tribes, cross-appeal from the district court's holding that the Secretary had a ministerial duty under the Brown-Stephens Act to pay over allottee funds in his possession upon the County's certification of delinquent taxes the allottees had consented to payment of. The tribes also maintain that the district court's remedy was beyond the scope of the Brown-Stephens Act. The Secretary and other federal defendants do not appeal. Upon review, we affirm the major substantive holdings of the district court, but for reasons explained below, vacate the judgment and remand the cause with directions to deny the mandamus relief sought.

## I.

Approximately 34,000 acres of land in Thurston County are held in trust by the United States for the benefit of individual members of the Winnebago and Omaha tribes. The land so held is divided into individual allotments, with designated Indian allottees holding the beneficial interest therein. In many instances, a large number of individuals have come to presently own an interest in a single piece of allotted land

fact to the said county treasurer, which certificate shall operate as a full release and

discharge of the tax assessed against the land of the Indian so without funds.

through descent and devise from the original allottees. For the purposes of this opinion, an allottee refers to any Indian owning an interest in allotted land.

Much of the trust patent land is leased to renters other than allottees, and it is this land the County seeks to collect taxes on. *See* 25 U.S.C. § 393. The Winnebago Agency, operating under the auspices of the Aberdeen Area Office of the Bureau of Indian Affairs (BIA), approves leases of trust patent land, collects rent due thereunder, and disburses the funds to Indians.

Most leases prior to 1972 provided for a cash rent or a share of the crops, and the payment of state and local taxes by the lessee. Most of the leases at issue here provided for the payment of rental and tax money by the lessee to the Winnebago Agency. The district court viewed these lease provisions as a consent to the imposition of taxes. In the years 1965 through 1971 rental money received by the Agency was credited to either of two types of accounts. Special Deposit (SD) accounts contained money set aside from rentals for the payment of County real estate taxes and was ultimately paid to Thurston County. Rents not directed to the SD accounts were credited to Individual Indian Money (IIM) accounts. IIM accounts were maintained in the name of each allottee or his heirs to whom the rental receipts belonged. *See* 25 C.F.R. Part 104. Subject to some restrictions, adult Indians have the right to withdraw funds held by the Secretary in an IIM account. 25 C.F.R. § 104.3.

In 1971 the Omaha and Winnebago Tribal Councils requested the BIA to stop paying the County taxes on trust patent lands.[3] No payments were made thereafter. In 1972 the Winnebago Agency discontinued the use of SD accounts. No such accounts were established for that year or subsequent years and what funds had previously been in the SD accounts were, beginning in 1972, transferred to the IIM accounts. This action appears to have followed a survey of allottees by the BIA in 1972 to determine whether they wished to consent to County taxation. Silence from an allottee was construed as a lack of consent. Only a handful of allottees consented to taxation. The district court found that affirmative refusal to consent or silence in response to the BIA survey was effective as a revocation of any consent theretofore given. Some money remained in the SD accounts until 1974, though the total amount steadily dwindled as individual allottees were located and their share of the SD funds transferred to their IIM account.

Since 1972 new leases of allotment land have not provided for the payment of County taxes, and there has been no other manifestation of consent to taxation on the allottees' part. Moreover, it appears that no rental income from which the allottees had consented to the payment of taxes remains in the possession of the Secretary.

The County treasurer, pursuant to the Brown-Stephens Act, certified overdue taxes to the Secretary for the years 1965 through 1972 as follows:[4]

| Date of Certification by County | Years Taxes Due | Total Overdue Taxes |
| --- | --- | --- |
| May 30, 1972 | 1965–68 | $ 49,565.00 |
| March 10, 1972 | 1969–70 | 112,344.00 |
| January 19, 1973 | 1971 | 95,511.78 |
| January 8, 1974 | 1972 | 102,177.37 |

3. It appears from the record that the request was made because of dissatisfaction on the part of the Indians with the services they were receiving from the County, particularly with regard to road maintenance. There was apparently also a feeling of discontent with the unique situation the Omaha and Winnebago Indians were in where, as Winnebago Tribal Council member LaRose put it, the Bureau of Indian Affairs acted as the "tax collector" for Thurston County.

4. Overdue taxes for years 1965 through 1972 were:
1965 — $ 6,392.00; 1966 — $ 11,043.88; 1967 — $ 14,434.49;
1968 — $ 17,694.63; 1969 — $ 28,027.98; 1970 — $ 84,316.02;
1971 — $ 95,511.78; 1972 — $102,177.37; TOTAL – $359,598.15.

With respect to overdue taxes for the years 1965–70, the Secretary failed to either pay the taxes or certify the non-availability of funds for payment. On March 20, 1973, the Secretary certified that there were no funds in his possession for the payment of 1971 County taxes, and on March 4, 1974 he similarly certified non-availability of funds for the payment of 1972 taxes. However, the district court found that in fact the Secretary did have rental funds in his possession when the County originally certified overdue taxes. Consequently, the district court held that the Secretary's certifications of non-availability were not effective to discharge the tax liability.

The County filed its complaint in this action after unsuccessful attempts to gain payment of the overdue taxes from the Secretary.

As noted, the district court held first that the allottees could not be compelled to pay a tax assessed against their trust patent land without their consent; second, that the allottees had consented to payment in years prior to 1972 by providing for payment of taxes in leases of allotted land and that with such consent the Secretary was bound under the Brown-Stephens Act to pay the certified County taxes from the allottees' rental receipts in his possession, which he had failed to do; and, finally, that the County could recover taxes only for years 1969 through 1971 under the limitations period the court deemed applicable. The district court directed payment of each allottee's 1969–71 tax liability from present funds belonging to the individual Indian allottees in the hands of the Secretary. The pertinent issues on which this appeal turns center on: (1) the requirement of the allottees' consent as a precondition to tax payments; (2) the nature of the Secretary's duties under the Brown-Stephens Act; and (3) the mandamus relief granted by the district court.

■ We find that we are in basic agreement with the district court except with regard to the relief granted. In our view, mandamus cannot be employed under the authority of the Brown-Stephens Act to compel the Secretary to withhold and make delinquent tax payments from present funds in connection with which the allottees have not consented to such payments.

## II.

### The Requirement of Consent.

In the mid-19th century both the Omaha and Winnebago tribes ceded or sold most of their land by treaty to the United States with the exception of reservation lands on which the Indians could live under the protection of the United States.[5] The treaties that brought the tribes to their present location in Thurston County, Nebraska were either silent as to the tax status of lands retained by the Indians or specified that Indian lands were to be exempt from taxation, levy, sale or forfeiture unless Congress provided otherwise. Furthermore, most of the treaties provided for a division of Indian land in severalty among the individual Indians with the approval and under the supervision of the President or the Secretary of the Interior.

The division of Indian lands in severalty or allotments to individual Indians evolved as a distinct policy of the federal government in the latter half of the 19th century, and though the policy has now long been abandoned, this lawsuit is very much a legacy of the period. *See Mattz v. Arnett,* 412 U.S. 481, 498, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Conroy v. Conroy,* 575 F.2d 175, 181 (8th Cir. 1978); *Chase v. McMasters,* 573 F.2d 1011, 1018 (8th Cir. 1978); *pet. for cert. filed,* —— U.S. ——, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978); 78 Cong.Rec. 11729 (1934) (remarks of Rep. Howard). With the

---

**5.** Treaty with the Winnebago Indians of March 8, 1865, 14 Stat. 671; Treaty with the Omaha Indians of March 6, 1865, 14 Stat. 667; Treaty with the Winnebago Indians of April 15, 1859, 12 Stat. 1101; Treaty with the Winnebago Indi- ans of February 27, 1855, 10 Stat. 1172; Treaty with the Omaha Indians of March 16, 1854, 10 Stat. 1043; Treaty with the Winnebago Indians of October 13, 1846, 9 Stat. 878.

passage of the General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.,* Congress authorized the executive branch to survey and allot to individual Indians substantially all reservation lands (with certain specified exceptions) suitable for agricultural purposes. 25 U.S.C. § 331; *see* F. Cohen, Handbook of Federal Indian Law 258 (1942) (hereinafter *Cohen* ). The district court found that the Winnebago and Omaha land in question was allotted under terms of the General Allotment Act.[6] Section 5 of the Act provided in pertinent part:

> Upon the approval of the allotments . . . the Secretary of the Interior . . . shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian

to whom such allotment shall have been made, or, in the case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided,* That the President of the United States may in any case in his discretion extend the period.

25 U.S.C. § 348. Under this system the United States retained legal title to each parcel of allotted land as trustee for the individual Indian allottee. The Indian's beneficial interest in the property was recorded on a trust patent which generally reflected the language of the statute.[7] *See United States v. Rickert,* 188 U.S. 432, 436, 23 S.Ct. 478, 47 L.Ed. 532 (1903). Section 6 of the General Allotment Act, 25 U.S.C.

6. We note that much of the land allotted to Omaha Indians appears to have been originally allotted pursuant to two special allotment statutes similar in language to the General Allotment Act: Act of August 7, 1882, c. 434, §§ 6, 8, 22 Stat. 341; and Act of March 3, 1893, c. 209, 27 Stat. 612, 630. *See Chase v. United States,* 256 U.S. 1, 5, 41 S.Ct. 417, 65 L.Ed. 801 (1921); Letter from Secretary of the Interior Franklin K. Lane to Representative Stephens (April 15, 1916), *reprinted in* H.R.Rep. No. 1098, 64th Cong., 1st Sess., 1, 2 (1916); A. Fletcher & F. LaFlesche, The Omaha Tribe, vol. 1, 33 (1972). There does not appear to be any functional distinction between the provisions of these statutes and the General Allotment Act, or in the trust patents issued under the respective statutes. Moreover, by its terms the General Allotment Act is applicable notwithstanding the existence of an antecedent special allotment statute. 25 U.S.C. §§ 331, 335. Thus, the focus of this opinion is on the General Allotment Act.

7. A typical trust patent states as follows:
United States to Lemmon
CERTIFIED COPY OF TRUST
PATENT
THE UNITED STATES OF AMERICA. TO ALL WHOM THESE PRESENTS SHALL COME, GREETING:
WHEREAS, There has been deposited in the General Land Office of the United States a schedule of allotments of land, dated September 25, 1893, from the commissioner of

Indian Affairs, approved by the Acting Secretary of the Interior September 28, 1893, whereby it appears that, under the provisions of the Act of Congress approved February 8, 1887, (24 Stats., 388) Cha shep ska win kaw or Cha shep ska win kaw Lemmon, an Indian residing on the Winnebago Reservation has been allotted the following described land, viz:—

NOW KNOW YE, THAT THE UNITED STATES OF AMERICA, in consideration of the premises and in accordance with the provisions of the fifth section of said Act of Congress of the 8th day of February 1887, hereby declares that it does and will hold the land thus allotted (subject to all the restrictions and conditions contained in said fifth section) for the period of twenty-five years, in trust for the sole use and benefit of the said Cha shep ska win kaw or Cha shep ska win kaw Lemmon, or, in case of her decease, for the sole use of her heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by Patent to said Indian, or her heirs as aforesaid in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided: That the President of the United States may, in his discretion, extend the said period.

§ 349, was amended in 1906 to allow the Secretary to issue a patent in fee simple to an allottee before the expiration of the trust period established in Section 5 of the Act upon a determination that the Indian was "competent and capable of managing his or her affairs." Act of May 8, 1906, c. 2348, 34 Stat. 182. The amendment and similar enactments of the period [8] were intended to accelerate the assimilation of the Indians by truncating the length of the trust period and the benefits derived therefrom for Indians determined to be competent. At the same time, however, by providing that upon issuance of a fee patent "all restrictions as to sale, incumbrance, or taxation . . . shall be removed", Section 6 clarified the intent of Congress in enacting the General Allotment Act that while the period of trusteeship over Indian land lasted, the land was to be held free from all taxes.[9] *Squire v. Capoeman,* 351 U.S. 1, 7–8, 76 S.Ct. 611, 100 L.Ed. 883 (1956).

As noted, federal policy no longer favors the allotment of Indian land. *See Conroy v. Conroy, supra* at 181. Through a succession of executive orders, and now by statute, the trust periods on allotted land have been extended indefinitely. *See* 25 U.S.C. §§ 461, 462.

Before federal policy shifted away from the vigorous attempt to assimilate Indian tribes, a number of cases arose which put in issue individual Indians' obligations to pay State and local taxes in situations where, under the authority of Section 6 of the General Allotment Act or like statutes,[10] a trust was unilaterally terminated and a patent in fee issued before the expiration of the trust period and without the Indian allottee's consent. *See Cohen, supra* at 259. Through a consistent course of adjudication, federal courts held with substantial unanimity that the allottees had a vested property right to tax exemption which could not be terminated without their consent prior to the end of the designated period of trust. *See, e. g., Glacier County v. United States,* 99 F.2d 733, 734 (9th Cir. 1938); *United States v. Nez Perce County,* 95 F.2d 232, 234–35 (9th Cir. 1938); *Board of Commissioners of Caddo County v. United States,* 87 F.2d 55, 56 (10th Cir. 1936); *United States v. Benewah County,* 290 F. 628, 631 (9th Cir. 1923); *Morrow v. United States,* 243 F. 854, 855-56 (8th Cir. 1917); *United States v. Ferry County,* 39 F.Supp. 1007, 1012 (E.D.Wash.1941); *United States v. Board of County Commissioners of Pawnee County,* 13 F.Supp. 641, 642 (N.D.Okla. 1936); *United States v. Board of Commissioners of Comanche County,* 6 F.Supp. 401, 402-03 (W.D.Okla.1934); *Cohen, supra* at 259. *See also Mahnomen County v. United States,* 319 U.S. 474, 476–77, 63 S.Ct. 1254, 87 L.Ed. 1527 (1943); *Kirkwood v. Arenas,* 243 F.2d 863, 869 (9th Cir. 1957); *State v. Zay Zah,* 259 N.W.2d 580, 584–85 (Minn.

---

**8.** *See* Clapp Amendments of 1906 and 1907, 34 Stat. 353, 1034 (applicable to mixed-blood Indians on the White Earth Reservation in Minnesota).

**9.** Section 6 provides in part:

At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section 348 of this title, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law: *Provided,* That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and *thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent:* . . (Emphasis added.) 25 U.S.C. § 349

**10.** *See Mahnomen County v. United States,* 131 F.2d 936, 938 (8th Cir. 1942), *rev'd on other grounds,* 319 U.S. 474, 63 S.Ct. 1254, 87 L.Ed. 1527 (1943). *See also* 25 U.S.C. § 372.

The policy in favor of promoting the conveyance of fee patents to Indians was later reversed and the Secretary of the Interior was provided with the authority to cancel fee patents and in effect restore the trust where such patents were issued without the consent or application of the allottee. *See* 25 U.S.C. § 352a.

1977). The operative expression common to nearly all allotment statutes and trust patents on which the vested right to tax exemption was necessarily predicated was the government's promise to convey the land in fee at the expiration of the trust "discharged of said trust and free of all charge or incumbrance whatsoever." 25 U.S.C. § 348. *E. g., United States v. Nez Perce County, supra* at 235. *See Squire v. Capoeman, supra* 351 U.S. at 7, 76 S.Ct. 611.

In the main, the cases recognizing a vested right to tax exemption relied on a logical extension of the contract law principles articulated by the Supreme Court in a 1912 case, *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912). *Choate* involved state taxation of Choctaw and Chickasaw allotment lands in Oklahoma pursuant to a federal statute which vitiated an earlier enactment providing that "the land should be nontaxable." *Id.* at 670, 32 S.Ct. at 567. The Supreme Court held that the Indians had a vested property right to tax exemption, reasoning that the exemption was part of the quid pro quo received by the Choctaws and Chickasaws in return for relinquishment of their equitable interest in tribal lands. *Id.* at 671–73, 678–79, 32 S.Ct. 565.

The district court likewise relied on *Choate v. Trapp,* and its progeny in holding that under the General Allotment Act the allottees had a vested right "to hold the trust patent lands as tax exempt property during the period of the trust." Thus, the district court applied the vesting principle to the present indefinite extension of the trust periods. *See Allbaugh v. United States,* 184 F.2d 109, 114–15 (8th Cir.) *cert. denied,* 340 U.S. 905, 71 S.Ct. 281, 95 L.Ed. 655 (1950); *Board of Commissioners of Jackson County v. United States,* 100 F.2d 929, 933 (10th Cir. 1938), *modified,* 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939). We believe the district court correctly did so.

This Court has twice before adhered to the basic position that Indian allottees enjoy a vested right to tax exemption on lands held in trust under the General Allotment Act in situations where a unilateral termination of the trust has been attempted without the consent of the individual allottee. *See Mahnomen County v. United States,* 131 F.2d at 938; *Morrow v. United States, supra* at 856. In our opinion, these cases and the weight of authority they represent, as well as more recent Supreme Court pronouncements in the area, compel the conclusion that the Omaha and Winnebago allottees have a property right to enjoy their allotted land free from state and local taxation while it is held in trust under the original trust patents.

The sources of this property right are twofold and closely related. First, viewing the pertinent treaties, trust patents, allotment statutes, and prevailing notions of the day together, we believe the original allottees should be considered to have exchanged their tribal rights for an allotted interest in reservation land, and as a result acquired an enforceable expectation that their allotments would be tax exempt while held in trust by the United States. Second, a right to tax exemption was part of the beneficial interest created in the allottees by trust patents issued pursuant to the General Allotment Act. In this respect, the trust established by the federal government was akin to a spendthrift trust which also ran to taxes on the res. The confluence of trust and contract law principles applied against the backdrop of the unique relationship between the federal government and the Indians convinces us that the original allottees and their heirs have a property right in the tax exemption of their lands which exists while the lands are held in trust under the original trust patents.

The sources of a contract or agreement between the Indians and the United States would here be found in the treaties with the Omahas and Winnebagos, the trust patents, and the terms of the General Allotment Act. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).[11] Most of the treaties pertinent to this action provided for the cession or sale

11. *See* notes 5–7, 9 *supra* and accompanying text.

of tribal lands to the United States in return for reserved land which, as recited in the treaties, could be distributed in severalty to individual Indians, plus the payment of cash and/or various other forms of consideration. Such land was also generally stipulated to be tax exempt unless otherwise provided by Congress. *See, e. g., Treaty with the Omaha Indians,* March 6, 1865, art. IV, 14 Stat. 667. Thus, the treaties generally reflect the rudiments of a contract between the tribes and the United States, and contemplate both the tax exemption and allotment of reserved land. *See Board of Commissioners of Jackson County v. United States,* 308 U.S. 343, 348–49, 60 S.Ct. 285, 84 L.Ed. 313 (1939). The treaties, coupled with the promise in the trust patents and the General Allotment Act to convey the land in fee "free of all charge or incumbrance whatsoever" at the conclusion of the trust period, when viewed together, may well be said to reflect a mutual understanding between the tribes and the federal government that the trust lands would be exempt from taxation during the period of trusteeship. *See Morrow v. United States, supra* at 856–58. *See also Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Squire v. Capoeman, supra,* 351 U.S. at 7, 76 S.Ct. 611. This conclusion finds additional support in the 1910 debate on the predecessor to the Brown-Stephens Act—the Brown Act—in which concern was expressed that taxation of Indian trust lands would be inconsistent with the "well-defined" policy "to let the taxation . . . begin with the expiration of the trust period." 45 Cong.Rec. 5449, 5450 (1910) (remarks of Representative Carter). Considering the treaties, allotment statutes and trust patents in light of the fact that tax exemption for Indian trust land was clearly one of the prevailing notions of the day which permeated Indian affairs, it is reasonable to believe the Winnebago and Omaha tribes, and through them the allottees, had an enforceable expectation that the allotted reservation land received in return for relinquishment of rights in ceded tribal lands was to be exempt while held in trust. *See Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 204, 98 S.Ct. 1011, 1019, 55 L.Ed.2d 209 (1978); *Sweet v. Schock,* 245 U.S. 192, 196, 38 S.Ct. 101, 62 L.Ed. 237 (1917); *Choate v. Trapp, supra,* 224 U.S. at 671–73, 32 S.Ct. 565.

■ Apart from contract principles, the language of the General Allotment Act and trust patents reflects an intent to grant state and local tax exemptions as part of the beneficial interest enjoyed by the allottees and their heirs. In *Squire v. Capoeman, supra* the Supreme Court dealt with a federal capital gains tax imposed on the sale of timber taken from allotted land. The allottee in *Squire* held his interest by virtue of extensions to the original trust period under executive order and 25 U.S.C. § 462, the same as in the instant case. *Id.,* 351 U.S. at 3–4, 76 S.Ct. 611 & n. 4. The *Squire* Court held that the tax was foreclosed under its interpretation of the General Allotment Act, particularly Section 6 of the Act, 25 U.S.C. § 349, which provides that a patent in fee eliminates "all restrictions as to sale, incumbrance, or taxation." [12] In discussing the effect of that section, the Court observed:

> The literal language of the proviso evinces a congressional intent to subject an Indian allotment to all taxes *only* after a patent in fee is issued to the allottee. This, in turn, implies that, *until such time as the patent is issued,* the allotment shall be free from all taxes, both those in being and those which might in the future be enacted. (Emphasis added.)

*Id.* at 7–8, 76 S.Ct. at 615. The Supreme Court also noted, in line with the reasoning of the earlier vested rights cases cited previously, that language in Section 5 of the Act, 25 U.S.C. § 348, to the effect that the United States must ultimately transfer the land in fee "free of all charge or incumbrance whatsoever" supports a similar conclusion. If, as *Squire* holds, Congress intended that allotments were to be tax free until a fee patent was issued, then it seems to us that while the trust continues, the

---

12. *See* note 9, *supra.*

individual Indian's property interest in an allotment acquired by virtue of the federal government's declaration of trust included the tax exemption feature. Since State and local governments may tax Indian trust lands only with the consent of Congress, e. g., *Mescalero Apache Tribe v. Jones, supra* 411 U.S. at 148, 93 S.Ct. 1267, Congress clearly was empowered to create a property right to local tax exemption as part of the package of rights enjoyed by individual allottees for whom a trust patent was issued.

 In concluding that the allottees have a property right to hold their allotted land free of taxes, we are also influenced by the peculiar fiduciary role played by the federal government as trustor and trustee of the allotted trust land, and as historic guardian of the Indian tribes. *See, e. g., Oliphant v. Suquamish Indian Tribe, supra* 435 U.S. 191, 98 S.Ct. at 1020 n. 17; *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Chase v. McMasters, supra* at 1017. Because of this relationship, where there is legitimate doubt about the rights conferred under a trust declared for the benefit of individual Indian allottees, the terms thereof must be construed in favor of the Indians. *E. g., McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Of course, the allottees do not enjoy tax exemption in perpetuity. The current trusts exist only by virtue of repeated extensions which are subject to legislative termination. Moreover, our opinion does not foreclose imposition of a possessory interest tax on the leasehold interest of allotted land. *See Fort Mojave Tribe v. San Bernadino County,* 543 F.2d 1253, 1256 (9th Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977). We hold only that the allottees have a vested right to consent or object to the payment of taxes under what may fairly be construed as the original declaration of trust while such declaration continues to define rights and responsibilities as between the federal government and the allottees. *See generally Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655–56, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976); *Sizemore v. Brady,* 235 U.S. 441, 449–50, 35 S.Ct. 135, 59 L.Ed. 308 (1914).

The final question is whether, as the County would enforce it, the Brown-Stephens Act is inconsistent with the allottees' vested rights. On its face the Act permits assessment and collection of State and local taxes on land held in trust by the United States for the Winnebago and Omaha Indians. *See* H.R.Rep. No. 1098, 64th Cong., 1st Sess. (1916). The Act does not literally permit a tax *on land* in the usual property law sense because delinquencies can be enforced only against rental income, and not realty. Nonetheless, in practical effect whatever is collected pursuant to the Brown-Stephens Act amounts to a tax on land. As the district court found, the allottees bear any tax burden imposed by Brown-Stephens, for tax payments are conceptually a part of rent owed by the lessee to the lessor. *See Allbaugh v. United States, supra* at 112. *Cf. Oklahoma Tax Commission v. Texas Co.,* 336 U.S. 342, 353, 69 S.Ct. 561, 93 L.Ed. 721 (1949). That the taxes are to be paid from the Indians' rental income from their land is immaterial, for any tax exemption on allotted land would also extend to rental income from which the property tax is deducted. *See Squire v. Capoeman, supra* 351 U.S. at 9, 76 S.Ct. 611. Indeed, from the allottees' perspective, the tax authorized under Brown-Stephens is akin to a tax on the privilege of renting the land, a privilege obviously a part of the use of the land itself. *Mescalero Apache Tribe v. Jones, supra* 411 U.S. at 158, 93 S.Ct. 1267. The Brown-Stephens Act therefore embodies a procedure for the collection of local taxes of a type the allottees would normally be exempt from. *Cf. United States v. Mason,* 412 U.S. 391, 394–96, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *McClanahan v. Arizona State Tax Commission, supra* 411 U.S. at 80–81, 93 S.Ct. 1257.

 At the same time, however, there is no suggestion in either the language or history of the Brown-Stephens Act that it was intended to alter any vested interest of the allottees. In the only previous case to

have considered the Act, *Allbaugh v. United States, supra,*[13] this Court noted that Brown-Stephens is capable of being construed as embracing "an implied right in the allottee to permit . . . payments to be made in any case where . . . consent might be necessary." *Id.* at 115. No party argues that the Indians may not voluntarily consent to the payment of otherwise exempt taxes if they wish to, as it is clear that they may. *See Mahnomen County v. United States,* 319 U.S. at 477, 63 S.Ct. 1254; *Allbaugh v. United States, supra* at 115. Thus, we conclude that the Brown-Stephens Act should be viewed as permitting non-lienable and non-obligational tax assessments against Indian trust land, and providing for the payment of such assessments out of rental funds in the Secretary's control if the allottee or his heirs consent to the payment.

*Duties of the Secretary.*

The Omaha and Winnebago tribes argue that the district court erred in concluding that the Secretary had a mandatory duty to disburse funds under the scheme provided in the Brown-Stephens Act upon the consent of the Indians to taxation. The tribes argue that the Secretary had an independent duty, derived from the policy supporting the General Allotment Act, to insure that any payments to Thurston County eventually inure to the benefit of the allottees. The use of the words "shall be authorized" to describe the Secretary's function under the Brown-Stephens Act is said to evince congressional recognition of this duty and an intent to preserve it by vesting the Secretary with discretion. The Secretary has not appealed.

The majority of this panel rejects the tribes' argument[14] and believes if the

---

**13.** *Allbaugh* involved a suit by the United States to recover unpaid taxes from a lessee of allotted land who by lease had agreed to pay such taxes as part of rent. The lessee appealed an adverse district court judgment, *inter alia,* on the ground that the Brown-Stephens Act was unconstitutional as an infringement of the Indians' vested right to tax immunity. This Court found it unnecessary to address the issue principally because the allottees in question had consented to payment of taxes by providing for such payment in the lease. 184 F.2d at 114–15.

**14.** The author of the panel opinion is unable to join in this aspect of the Court's holding. However, because the resolution of this appeal does not turn on the nature of the Secretary's duty under the Brown-Stephens Act, I have confined articulation of my views to a footnote. The panel is unanimous on all other points.

The Brown-Stephens Act provides that upon certification by the county treasurer of unpaid and overdue taxes on Indian land, the Secretary "shall be authorized to pay the same" from rental funds in his control belonging to the Indians. It is axiomatic that an action in the nature of mandamus can only lie if the duties sought to be enforced are "ministerial duties of a nondiscretionary nature," *Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 318, 78 S.Ct. 752, 757, 2 L.Ed.2d 788 (1958), which are plainly defined and peremptory. *See, e. g., Schulke v. United States,* 544 F.2d 453, 455 (10th Cir. 1976); *Rural Electrification Administration v. Northern States Power Co.,* 373 F.2d 686, 694–95 n. 14 (8th Cir.), *cert. denied,* 387 U.S. 945, 87 S.Ct. 2079, 18 L.Ed.2d 1332 (1967). In the context of Indian affairs, I cannot agree

that a plainly defined duty admitting of no discretion is imposed on the Secretary by statutory language which "authorized" him to pay delinquent county taxes, *see Creek Nation v. United States,* 318 U.S. 629, 639, 63 S.Ct. 784, 87 L.Ed.2d 1046 (1943), and more importantly, I discern no such duty in the limited and ambiguous legislative history of the Brown-Stephens Act. *See* H.R.Rep. No. 1098, 64th Cong., 1st Sess. (1916) (the House and Senate reports on the Act were identical); 45 Cong.Rec. 5449 (debate on the substantially identical predecessor to the Brown-Stephens Act, the Brown Act, Act of May 6, 1910, c. 202, 36 Stat. 348). Suffice it to say that the inferences to be gained are conflicting; the relevant debates, such as they were, tend to favor a mandatory duty, the committee reports implicitly favor discretion. *See Housing Authority of City of Omaha v. United States Housing Authority,* 468 F.2d 1, 6–7 n. 7 (8th Cir. 1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973). For me, the absence of a clearly prescribed mandatory duty means that the Secretary may not be compelled to make payments through mandamus.

I would not adhere to this position if it ran against the obvious tenor of the Act; however, in view of the circumstances prevailing when Brown-Stephens was enacted in 1916, it is perfectly reasonable to believe that Congress intended to simply authorize the Secretary to pay delinquent taxes to Thurston County when to do so would be mutually beneficial to the County and the Indians. *See Allbaugh v. United States, supra* at 111 n. 1, 116. The severe financial crisis in Thurston County caused by large amounts of tax exempt land and which

Brown-Stephens Act is to be given any viability it must be construed so as to require the Secretary to pay out rental funds in his possession during the time that the statute declares the duty to exist. Moreover, in the majority's view, this Court implicitly held that Brown-Stephens imposed a nondiscretionary duty in *Allbaugh*. The *Allbaugh* court, in a suit involving recovery of the tax portion of rent under a lease of allotted land, recognized that technically the right to recover rent in the form of unpaid taxes belonged to the allottees. Nevertheless, this Court directed modification of the district court's judgment to require that the delinquent tax money be paid into the registry of the court for direct disbursement to Thurston County. 184 F.2d at 116. By directing payment to the County rather than to the allottees or Secretary, the *Allbaugh* court sought to effectuate congressional intent that the Brown-Stephens Act "be an instrument for bringing revenue into the treasury of Thurston County, as a means of furthering the welfare and advantage of the Indian allottees and of benefitting their properties." *Id.* The rationale employed in this aspect of the *Allbaugh* decision applies with equal force here.

▮ Accordingly, if the Secretary has funds from the rentals of allotted land in his control from which an allottee has con-

sented to the payment of taxes, he is obligated to make payments of delinquent taxes pursuant to the statutory scheme set forth in the Act within a reasonable time after certification of delinquent taxes by the County.

### The District Court Remedy.

The district court issued a writ of mandamus directing the Secretary to pay each allottee's proportionate share of certified delinquent taxes for 1969, 1970, and 1971 from funds belonging to allottees and in the Secretary's control. In the event any allottee had insufficient funds on deposit with the Secretary to satisfy payment of his or her individual share of consented-to taxes, the Secretary was directed to pay the balance from rental income received by the allottee over a three-year period. Payment of the balance could be made in lump sum or distributed over the three-year period in the Secretary's discretion.

From the record before us it appears that rents allocated to taxes from pre-1972 leases have been distributed to the allottees' general IIM accounts and presumably have been withdrawn by the allottees or comingled with other funds in the IIM accounts over time. Therefore, implicit in the district court's judgment is the conclusion that

precipitated enactment of the Brown-Stephens Act, was unlikely to have been considered a problem of long duration in view of the then prevailing federal policy promoting the issuance of patents in fee. As a consequence, the Act is stamped with the qualities of an interim measure. *See* H.R.Rep. No. 1098, 64th Cong., 1st Sess. 2, 3 (1916). *See also* S.Rep. No. 397, 61st Cong., 2nd Sess. (1910). Moreover, as the district court implicitly recognized in its judgment entry, there is an obvious potential for hardship to individual Indians in a mechanical application of the Act. Thus the district court allowed the Secretary an option to distribute tax payments from rentals over a period of years in cases where a lump sum deduction from rent would have been "unnecessarily harsh." So, too, in the ordinary operation of the Act, by the time the County certifies delinquent taxes, some allottees who theretofore consented to the payment of taxes may be in such a position that deductions from their rents for payments would threaten rather than enhance the allottees' welfare. In recognition

of the fiduciary obligations of the federal government to these Indians, it seems to me that Congress may well have intended to reserve some discretion in the Secretary to decline to make payments or to make partial payments of certified delinquent taxes where to do so would better effectuate the symbiotic purposes of the Brown-Stephens Act—the mutual benefit of Thurston County and the many allottees who hold land there. In my judgment, the failure of the Secretary to make a determination in this regard is the true source of complaint here, not his failure to pay delinquent taxes per se.

I do not believe *Allbaugh* requires a different result. The Court there *sua sponte* modified the judgment entry in apparent response to the government's dissembling about what it intended to do with the recovery. The question before us was not presented or discussed. Under these circumstances, I do not believe the implications of the *Allbaugh* judgment entry should be controlling.

the Secretary was empowered to pay delinquent taxes out of funds from which the allottees had not consented to the payment of taxes. The view we take of the authority conferred by the Brown-Stephens Act does not allow the remedy granted by the district court. While it may be true that Thurston County was wrongfully deprived of funds as a collateral result of the Secretary's failure to properly exercise his responsibilities under the Act, the allottees cannot be visited with the consequences of that failure through a mandamus action which, by its very nature, only enforces duties imposed by the statute. *See, e. g., Billiteri v. Board of Parole*, 541 F.2d 938, 946 (2d Cir. 1976).

 While formally and technically a mandamus judgment against the Secretary, it is clear that in operation the district court's judgment is directed at the allottees with the office of the Secretary employed as a device to extract funds from the allottees which are no longer in the Secretary's possession; viz., rents from pre-1972 leases. This result is at odds with the limited authority granted by the Brown-Stephens Act and, in fact, enables the County to indirectly impose liability on the allottees when it is clear that it could not do so directly. We have held that the Brown-Stephens Act creates a mechanism for the payment of delinquent real property taxes from rental receipts in the Secretary's possession if the allottees have given their consent to such payment. The Act does not create a cause of action for delinquent taxes; nor does it impose any form of inchoate liability on the Indians. There is, in short, no authority for deducting tax payments from the allottees

rental income unless they have consented to the use of that income to pay taxes. Since the funds from which the allottees consented to a deduction for taxes have been distributed, and the Indians have not consented to payments in leases since 1972, there is no way to recapture the money from individual allottees through a mandamus action to enforce the Secretary's duties under the Brown-Stephens Act.

We sympathize somewhat with the district court's attempt to grant some limited recoupment to the County. The County, in what has apparently been the first contested attempt to enforce the Brown-Stephens proviso,[15] has seen a regular flow of revenue cease as the allottees asserted their rights. But neither this fact, nor the fact that the Secretary failed to act properly upon the County's certifications, broadens the scope of the Secretary's authority under the Brown-Stephens Act or subjects the allottees to individual liability for delinquent taxes. The Secretary no longer has rental funds in his possession from which the allottees consented to deductions for delinquent taxes. The money having been distributed to the allottees, and there existing no cause of action against the allottees for delinquent taxes, the Brown-Stephens Act cannot be employed to effect deductions from present rental income against the Indians' consent.

Accordingly, we vacate the district court's judgment issuing a writ of mandamus directed to the Secretary.[16] Because the relief sought by the County was peculiarly in the nature of mandamus, this disposition effectively terminates the litigation.[17]

15. Prior to this case the Secretary appears to have consistently treated a portion of the rent on allotment leases as taxes due Thurston County, and to have paid the same on a regular basis to the County.

16. Our holding that the Secretary may not pay past consented-to taxes from present rental income against the allottees' consent makes it unnecessary for us to consider the County's challenge to the district court's holding that the pertinent statute of limitations limited the

County in most cases to recovery of taxes for tax years 1969, 1970, and 1971.

17. Though we hold mandamus relief is unavailable because the funds subject to such relief have been distributed to the allottees, this cause of action is not moot. First, our holding that the Indians have the right to consent or object to the tax payments is a necessary predicate to any finding of mootness as it relates to other issues. Second, with regard to the Secretary's duties, we are satisfied that this cause

Judgment vacated and the cause is remanded with directions to enter judgment denying issuance of a writ of mandamus.

falls into the narrow category of cases in which a problem is capable of repetition, yet evading review. *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Further, the issue is of sufficient public importance to command our attention. *Bright v. Taylor*, 554 F.2d 854, 859 (8th Cir. 1977).